Lynn **PORTER**, Appellee,

v.

**John P. ASHMORE, Jr., Greenville County Supervisor, A. C. Thompson, Greenville County Jailer, William D. Leeke, Director of the Department of Corrections and the State of South Carolina, Appellants.**

**No. 13597.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1969.

Decided Feb. 10, 1970.

C. Tolbert Goolsby, Jr., Asst. Atty. Gen. of S. C. (Daniel R. McLeod, Atty. Gen. of S. C., Emmett H. Clair, Asst. Atty. Gen. of S. C., B. O. Thomason, Jr., Solicitor, Thirteenth Judicial Circuit, and H. F. Partee, Asst. Sol., Thirteenth Judicial Circuit, on the brief), for appellants.

Kale R. Alexander, Columbia, S. C. (David A. Fedor, Columbia, S. C., on the brief), for appellee.

Before SOBELOFF, BOREMAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Lynn Porter was convicted of occupying a house containing gambling paraphernalia in violation of S.C. Code of Laws § 16-515(2) (1962). The South Carolina Supreme Court affirmed his conviction. State v. Porter, 251 S.C. 393, 162 S.E.2d 843 (1968), cert. denied, 393 U.S. 1079, 89 S.Ct. 859, 21 L.Ed.2d 773 (1969). On petition for a writ of habeas corpus, the district court adjudged Porter's conviction unconstitu-

tional on the ground that a search of his home incident to the arrest was over-broad. The court held that the unconstitutional search, in turn, required the exclusion of evidence seized and offered to prove Porter's guilt. The state appealed. We reverse.

Ted M. Owens, an agent with the South Carolina Law Enforcement Division, was assigned to investigate gambling activity in Greenville County, South Carolina, on August 24, 1965. He testified at Porter's trial that he received, from a "reliable source," the telephone number of a party accepting bets on baseball and football games. He called the number and began placing bets with the party who answered; on the stand he identified the voice on the phone as that of Lynn Porter. Owens made wagers on a weekly basis with Porter through December 1965, usually placing the bets by phone and leaving the money bet at the desk of the Imperial 400 motel. Someone, inferentially Porter, would later pick up the money at the motel.

On December 29, 1965, Owens received information that Porter had gambling paraphernalia and parlay cards at his home. He then signed an arrest warrant for Porter and proceeded, with four other officers, to Porter's residence. According to the officers, Mrs. Porter answered the officers' knock at the door by pushing it open slightly. Seeing the police outside, she shut the door and went away. Porter himself then came to the door and asked whether the officers had a search warrant. They told him they had an arrest warrant, and Porter opened the door. The police stepped in and read the warrant to him. Lieutenant Coleman, one of the officers present, then told Porter that he wanted to look around, to which Porter is said to have replied, "Go ahead," or "Help yourself." The police then searched the premises. In a basement room some distance from the point of the arrest they found a phone with four or five incoming lines, some parlay cards, dice, playing cards, and "odds" books. The par-

lay cards and odds books were introduced at Porter's trial.

While the police were at the Porter residence, Mrs. Porter requested that she be allowed to take her children and go to a neighbor's house. Before she left, however, the officers asked her whether she had any parlay cards, or other gambling equipment, in her purse. She replied by offering to hand over her bag, but one of the police told her to open it instead. When she complied, the officer noticed a billfold inside and asked if there was money in it. Mrs. Porter took out $105 and gave it to the police, who told her they would have to hold the money until they could determine whether it was cash mailed to Porter by Owens. They subsequently confirmed, by an examination of the serial numbers, that part of the money had been sent to Porter on a "bet" placed by Owens. This money was also introduced at the trial.

Porter attacks his detention on two grounds: (a) that the search and seizure without a search warrant was invalid, even though made contemporaneously with and incident to a lawful arrest; (b) that he did not waive his constitutional protection by consenting to the search.

I.

 The district court ordered Porter's release prior to the decision in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which held a search without a warrant impermissible if it extends beyond the arrestee's person and the area from which he can obtain a weapon, or obtain and destroy something that can be used as evidence against him. Consequently, we must determine whether Chimel is to apply retrospectively to the search in this case. We are convinced that it should apply only prospectively.

In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court held the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), inap-

plicable to cases finally decided prior to *Mapp*. The Court in *Linkletter* enumerated three considerations proper in deciding an issue of retrospectivity: the purpose of the rule being considered, the reliance placed upon the previous rule or doctrine, and the effect of a retrospective application on the administration of justice. See Linkletter v. Walker, 381 U.S. at 636, 85 S.Ct. 1731 (1965); see also Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). As applied to *Mapp*, these considerations dictated a prospective application. Since *Chimel* is merely an extension of the *Mapp* exclusionary rule to a new situation, it is clear, we think, that prospective application of the former rule is also required.

In *Linkletter* the Court stated that it would not serve the purpose of the exclusionary rule to apply it retrospectively. The purpose of the rule, of course, is not to exclude untrustworthy evidence from the jury, but to deter unlawful police conduct. Prior police activity cannot be corrected by retrospective application of an exclusionary rule. Deterrence of future conduct will be served as well by prospective application. The same reasoning is applicable to the extension of the exclusionary rule in *Chimel*.

The Court in *Linkletter* also pointed out that the states had relied heavily on the doctrine of Wolf v. Colorado, 338 U. S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), prior to *Mapp* and concluded that retrospective application of the exclusionary rule would unduly tax the administration of justice. Similarly, before *Chimel* a "reasonable" search incident to a lawful arrest, but without a search warrant, was valid, even though it extended beyond the person and immediate vicinity of the person arrested. United States v. Rabinowitz, 339 U.S.

56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The state authorities were entitled to, and did, rely on the validity of a search so conducted. We hold the *Chimel* rule is to apply only to searches conducted after June 23, 1969, the date of decision in that case. Compare Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Williams v. United States, 418 F.2d 159 (9th Cir.1969).

## II.

■ The validity of the search in this case must be determined under the rules promulgated in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), and Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), both of which were overruled by *Chimel*. See 1969 Duke L. J. 1084. In *Harris*, five F.B.I. agents arrested the defendant in his apartment pursuant to valid arrest warrants. The agents had not obtained search warrants, but they searched the entire apartment and uncovered certain canceled checks. They also discovered eight draft classification cards and eleven registration certificates, which bore the stamp of a local draft board. The checks were related to the crime for which defendant was arrested, but the cards and certificates were not. Nevertheless, on the basis of the evidence seized Harris was convicted for unlawful possession, concealment, and alteration of classification cards and registration certificates. The Supreme Court held the search and seizure valid, stating the test to be whether the search incident to a lawful arrest was reasonable under all the circumstances. The agents were present in the apartment lawfully, pursuant to valid arrest warrants, and their search was directed specifically to the means and instrumentalities by which the crimes charged had been committed.[1]

---

1. The Court, in its opinion, refers to the so-called mere evidence rule, which was subsequently overruled in Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The applicability of Harris to the present search is not affected by the demise of the mere evidence rule, since the police here were searching specifically for gambling paraphernalia.

As a result, both the evidence sought and the evidence fortuitously discovered were held subject to seizure.

In *Rabinowitz*, government agents arrested defendant in his one-room office. The arrest was pursuant to a valid arrest warrant, but no search warrant had been issued. The agents searched the office for an hour and a half, uncovering and seizing 573 stamps on which "overprints" had been forged. The Court declared that the constitution prohibits only unreasonable searches and that the reasonableness of a search depends upon the circumstances of each case. Because the search and seizure were incident to a lawful arrest, the place searched was a business room to which the public was invited, the room was small and under the complete control of respondent, the search did not extend beyond the room, and the possession of the forged stamps was a crime, the Court declared the search reasonable.

 In the case before us now the district court decision rests squarely on Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), which required that a search warrant be obtained where practicable. *Rabinowitz*, however, specifically overruled *Trupiano* to the extent that it required a search warrant where reasonable to procure one, rather than merely requiring the search itself to be reasonable. Under the rule of *Harris* and *Rabinowitz* it is clear that a search incident to a lawful arrest may extend beyond the immediate vicinity of the one arrested. How far a pre-*Chimel* search may ultimately extend depends entirely on the facts of each case. In this case the search was reasonable under all the circumstances because: (1) the officers were conducting a search for specific evidence (gambling paraphernalia, parlay cards, and bills with particular serial numbers), not a general exploratory search with no definite aim in mind; (2) the search and seizure were incident to a lawful arrest, based on probable cause developed after extensive investigation; (3) there was, at the time of the arrest and search, no South Carolina statute authorizing the officers to obtain a search warrant for gambling paraphernalia;[2] (4) if the officers had not conducted the search, there was good reason to fear that the evidence would have been destroyed or concealed. Indeed, since the officers could not obtain a search warrant for the items, there would have been no method available to obtain the incriminating evidence; (5) finally, occupying a house containing gambling paraphernalia was the very crime for which Porter was being arrested, and, as a result, a search for the gambling paraphernalia within the house was entirely reasonable. Under a test of reasonableness, therefore, the search and seizure incident to a lawful arrest were valid, and the district court erred in directing Porter's release. Because the search and seizure were valid, we do not reach the issue of consent to the search.

Reversed.

---

2. The absence of an authorizing statute would not, of course, legitimate a search where a warrant is constitutionally required—as, for instance, under the new rule promulgated by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), where a warrant will be required in every instance for a search beyond the vicinity of the person arrested. We do not accept the argument that the absence of an authorizing statute demonstrated the South Carolina Legislature's intent that no search for gambling paraphernalia should be conducted in the state. This interpretation of the legislative intent is unreasonable in light of a statute making it illegal to occupy a house in which gambling paraphernalia is located. The South Carolina Legislature has, subsequent to this case, amended the law to allow the issuance of a search warrant for any property used in the commission of a crime. S.C.Code of Laws § 17–271 (1962), as amended, (1968 Supp.).