**UNITED STATES of America**

v.

**Eugene E. THWEATT, Appellant.**

**No. 22772.**

United States Court of Appeals, District of Columbia Circuit.

Submitted on Briefs on March 6, 1970.

Decided June 30, 1970.

Mr. Edward J. Hickey, Jr., Washington, D. C. (appointed by this Court), submitted on the brief, for appellant.

Mr. Broughton M. Earnest, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, submitted on the brief for appellee.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

TAMM, Circuit Judge:

On November 20, 1968, appellant was convicted of burglary in the second degree (22 D.C.Code § 1801(b) (Supp. III 1970)) and grand larceny (22 D.C.Code § 2201 (1967)); he was sentenced to serve a term of ten years under section 5010 (c) of the Youth Corrections Act (18 U.S.C. § 5010(c) (1964)). Appellant urges that his conviction should be reversed on the basis of two primary considerations: (1) that it was erroneous for the district court to deny the motion to suppress certain evidence seized incident to the arrest, and (2) that the district court erred in submitting the case to the jury and in denying the motions for a new trial or judgment of acquittal on the charge of grand larceny due to the

paucity of evidence concerning the value of the goods stolen.

## I.

■ We need not dwell long upon appellant's first contention. The first prong of appellant's suppression theory suggests that a plan was conceived by the arresting officer to arrest appellant at his home in order to conduct a search incident to the arrest, it being the officer's belief that he did not have sufficient probable cause to merit the issuance of a search warrant. (Tr. 173–174, 180.) Appellant contends that this course of conduct is violative of the standards set by this court in McKnight v. United States, 87 U.S.App.D.C. 151, 183 F.2d 977 (1950).[1] In the present case there is no evidence that the police officers had reasonable alternatives to making the arrest in appellant's home; however, there is evidence in the record indicating that the police did not know appellant's work address and that the arrest was made on the same day the warrant was issued. (Tr. 175.) It appearing to us that the arrest was made as expeditiously as possible and at the only place where it was known that appellant could be found, appellant's *McKnight* argument must be rejected.

■ We turn our attention now to the second prong of appellant's allegation of error relating to the failure of the district court to suppress evidence seized incident to appellant's arrest. Probable cause for the issuance of the arrest warrant resulted from the identification of appellant's photograph by two witnesses. A pawnbroker identified appellant as the man who, on the day of the burglary, pawned a typewriter of the make and model of one taken in the burglary. (Tr. 93.) Mr. Finger, the victim of the burglary and larceny, also identified appellant's photograph, indicating that he was the man who knocked at Mr. Finger's door some three days before the crimes occurred and who, upon being told that the person for whom he asked did not live at that apartment, asked Mr. Finger whether he lived alone and whether he worked. (Tr. 114–115, 125.) Appellant does not argue that there was no probable cause for the issuance of the arrest warrant; his argument goes only to the admissibility of the evidence seized incident to the arrest.

■ Armed with this valid arrest warrant, the officers went to appellant's home on the evening the warrant was issued and arrested him. It is apparent from the record that the arresting officers had formed a plan to take Mr. Finger along with them when they went to make the arrest, for the purpose of identifying any items seized in a search of the premises. (Tr. 173–174.) We need not consider the propriety of such a course of action because Mr. Finger did not in fact accompany the officers at the time of the arrest. The fact that the officers might have entertained the idea of taking Mr. Finger along does not present us with an actual controversy but rather it presents only a hypothetical situation, for the plan was never executed. (Tr. 175.)

What actually did occur was an arrest pursuant to a valid arrest warrant and the seizure of items in the plain view of the officers when they entered appellant's apartment to arrest him. Appellant contends that such a search is violative of the standard set forth by the Su-

---

1. In *McKnight* the arresting officers' intent to conduct a search incident to the arrest was made abundantly clear by the fact that they ignored numerous opportunities to arrest McKnight before he entered the house which was the target of the search, including the opportunity to arrest him when, in making his way into the house, McKnight walked directly past an officer stationed in the street in front of the house. This intentional delay was the key factor in the court's reversal of McKnight's conviction. *Cf.* Hutcherson v. United States, 120 U.S.App.D.C. 274, 281, 345 F.2d 964, 971, cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965) (Chief Judge Bazelon concurring and dissenting) ; Smith v. United States, 103 U.S.App.D.C. 48, 57, 254 F.2d 751, 760, cert. denied, 357 U.S. 937, 78 S.Ct. 1388, 2 L.Ed.2d 1552 (1958) (Chief Judge Bazelon, dissenting).

preme Court last term in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). We cannot agree. While the Court in that case specifically overruled the broader holdings of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and United States v. Rabinowitz, 339 U.S. 56, 70 S. Ct. 430, 94 L.Ed. 653 (1950), the Court made it evident that the "plain view" doctrine was not abrogated. After couching the rationale for limited "search incident to arrest" in terms of whether it was reasonable "for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use" (395 U.S. at 763, 89 S.Ct. at 2040), the Court stated:

> In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. * * * There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or *other closed or concealed areas in that room itself.* Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.

(*Id.*; emphasis added.) The clear implication of this passage is that searches incident to arrest may not be made without a warrant in situations other than those in which the search is designed to assure the safety of the officers making the arrest,[2] to prevent the destruction of evidence, and in certain specified extraordinary circumstances.[3]

The rule in *Chimel* was promulgated by the Supreme Court after the seizure in the present case took place; however, we need not determine the retroactivity of that doctrine[4] due to the clear language in the opinion stating that it is "closed or concealed areas in that room" which are covered by the rule. This court has recently reiterated its belief that the "plain view" doctrine survives

2. The essential criterion of officer safety which underlies the "stop and frisk" cases, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917 (1968), prevails today in the search incident to arrest area. Chimel v. California, 395 U.S. 752, 762–763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

3. These exceptions, which run the gamut from hot pursuit to response to an emergency to seizure of contraband in an automobile, arise from the exigencies of each situation and do not apply to the search of a home or apartment for articles which will remain there long enough for the officers to procure a warrant for their seizure. For the circumstances which will give rise to a valid exception to the rule in *Chimel*, see, e. g., Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); Brinegar v. United States, 338 U.S. 160, 176–177, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); McDonald

v. United States, 335 U.S. 451, 455–456, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

4. Although we are not required to pass on the retroactivity question, we note that, while the Supreme Court has left the question open (Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969); Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969)), many of our sister circuits have held that the criteria of *Chimel* will be given only prospective application. *See* Porter v. Ashmore, 421 F.2d 1186 (4th Cir. Feb. 10, 1970), petition for cert. filed, 38 U.S.L.W. 3410 (April 21, 1970); Williams v. United States, 418 F.2d 159 (9th Cir. Oct. 17, 1969), cert. granted, 397 U.S. 986, 90 S.Ct. 1120, 25 L.Ed.2d 394 (March 24, 1970); United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969); Lyon v. United States, 416 F.2d 91 (5th Cir. 1969), cert. denied, 396 U.S. 1023, 90 S.Ct. 597, 24 L.Ed.2d 516 (1970).

*Chimel.* In an *en banc* decision issued this term we stated:

> Since we hold that the police acted reasonably and lawfully when they took the action, without a warrant, of entering the house and searching for Dorman in appropriate places, no valid objection can be made to their conduct, when in the course of the search in the closet for Dorman they saw the uncuffed trousers readily identifiable as coming from the store that had been robbed, in seizing this clothing notwithstanding the absence of a warrant.

Dorman v. United States, 140 U.S.App. D.C. ——, 435 F.2d 385, at 394 (April 15, 1970). An even stronger case for application of the "plain view" doctrine is presented by the case at bar, in which there was a valid arrest warrant and in circumstances in which no search was necessary (whether for the arrestee or evidence) to bring the officers face to face with items they could reasonably believe to be fruits or instrumentalities of the crime.

This court has long recognized that no warrant is required when the questioned evidence is in such plain view as to require no search. Hiet v. United States, 125 U.S.App.D.C. 338, 372 F.2d 911 (1967). We reaffirmed the following year that "[w]e have long since pointed out that mere observation does not constitute a search, as where the officer has good reason to believe that the fruits of crime are freely exposed on the suspect's property." Creighton v. United States, 132 U.S.App.D.C. 115, 116, 406 F.2d 651, 652 (1968). We recognized the necessity of such a rule long ago: "Law enforcement is difficult enough, without requiring a police officer to free his mind of clues lying flatly before him." Ellison v. United States, 93 U.S.App.D.C. 1, 3, 206 F.2d 476, 478 (1953). That the Supreme Court agrees with our view of this type of situation cannot be questioned in light of the statement of that Court in affirming our *en banc* decision in Harris v. United States, 125 U.S.App. D.C. 231, 370 F.2d 477 (1966):

> Once the door had lawfully been opened, the registration card, with the name of the robbery victim on it, was plainly visible. *It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.* Ker v. California, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (emphasis added).

■■■■ Among the items which Mr. Finger listed as stolen were a "very dark green wool suit jacket and vest, a light medium grey lightweight woolen suit, a grey tweed sports jacket, [and] another pair of woolen slacks * * *." (Tr. 104.) The arresting officer described the events surrounding the arrest as follows:

> As I entered the apartment, I advised Mr. Thweatt we had a warrant for his arrest and he was under arrest, and advised him of his rights. His wife and a friend were present and the Defendant was present, along with the officers.

> We were in between the kitchen and the hallway and the bathroom. And as I turned around to my rear, there was an open closet, no doors on it, and I glanced at the items of clothing that were on the hangars, and I observed at that time the clothing that is spelled out in the 251, jackets, grey jacket, medium grey jacket, that looked like to be [*sic*] property belonging to Mr. Finger.

> At that time I went over to the closet, which [has] no door on it.

> \* \* \* \* \* \*

> And examined the particular item and found it to be one of the items. \* \* \*

Q This, you are referring to, the grey sport jacket?

A Yes, sir, Stearns label.

Q Now, where in the apartment did you recover the suit jacket and matching vest?

A Well, it is right to the rear. It is between the bathroom and the entrance to his apartment.

Q Was this the same closet where the other jacket was located?

A Yes, sir.

(Tr. 175–177.) On the basis of such a plain view discovery of the fruits of a crime which were identified both by description and label, it was not only reasonable for the officers to seize them notwithstanding the absence of a search warrant, but it would have been a dereliction of their duty for them not to do so. To say that the police must leave evidence which they find (without engaging in an improper search) in order to go after a search warrant, on the assumption that the items will remain in the same place until they return with the warrant, is to ignore reality.

This entire area of the law is permeated with fine lines between the constitutional rights of citizens and the need to protect that same citizenry; this is the basis of the reasonableness standard required by the Fourth Amendment. It has been recognized that:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

McDonald v. United States, 335 U.S. 451, 455–456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). We might add that obviousness is a form of exigency in the sense that failure to act immediately when confronted with evidence in this manner may result in its disappearance. The courts have long recognized that, although the citizen is entitled to protection from arbitrary search at the hands of over-zealous policemen, so is the policeman who is doing his job in the best way he can entitled to protection from the person he is arresting. (*See* note 2, *supra*, and accompanying text.) In like manner he is entitled to cooperation from the courts so that his hands are not tied by rules which are so stringent as to be unworkable.[5]

As we recently noted in Dorman v. United States, *supra*, "[t]he courts have respect for the intelligent law enforcement activities of the police,

---

5. The Supreme Court eloquently posited the dichotomy in Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949):

> These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men * * *. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

situated as they are in the front line of the campaign for law and order. * * " (435 F.2d at 394.) We went on to state that "[r]esponsible police are aware that a responsible procedure, which accords to the police the latitude for intelligent law enforcement but withholds absolute discretion, is the sound approach for securing the overall combination of law and justice that is the inspiration of a democratic society." (435 F.2d at 394.) Recognizing our responsibility to view the Fourth Amendment under the standard of reasonableness, we hold that it is well within the criteria of existing cases for the police to seize fruits, instrumentalities or evidence of crime [6] which they recognize to be of importance to the prosecution of the arrestee when the items involved are in the plain view of the police when they enter the premises to make the arrest, either armed with an arrest warrant, as in the present case, or in the more limited circumstances outlined in Dorman v. United States, *supra,* when the arrest is made with probable cause but without a warrant.[7]

### II.

Appellant's second contention is that there was no evidence of the value of the items taken and that, in the absence of specific evidence on that point, it was error to submit the grand larceny charge to the jury, allowing the jurors to speculate as to the value of the articles. We agree with this contention.

6. That evidence now falls within the purview of the items which the police may reasonably take is established by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) in which the Supreme Court rejected the "mere evidence" rule.

7. Although there was a further search of the premises which revealed additional items belonging to Mr. Finger, the trial court excluded those items from evidence at the trial; we therefore are not called upon to test the validity of their seizure. The fact that there was a further, and perhaps illegal, search of the prem-

■ It is fundamental that we must view the evidence in the light most favorable to the government;[8] it is equally fundamental, however, that the government must introduce probative evidence of each and every element of the crime charged, including the value of the property which was taken,[9] and that failure to offer such proof is fatal to the government's case. As our sister circuit pointed out in United States v. Wilson, 284 F.2d 407, 408 (4th Cir. 1960):

Nor, in the absence of any proof of value, could the jury be permitted to speculate on this point merely from the appearance of the articles. A fact which distinguishes a violation punishable by imprisonment for not more than one year from a violation punishable by imprisonment for ten years cannot be permitted to rest upon conjecture or surmise. *In order to sustain the imposition of the higher penalty, it was as incumbent upon the Government to prove a value in excess of $100.00 as it was to prove the identity of the defendant as the perpetrator of the crime, or the ownership of the property.* [Emphasis added.]

To the same effect is our opinion in Ransom v. United States, 119 U.S.App.D.C. 154, 337 F.2d 550 (1964), wherein we said that a conviction for grand larceny must be reversed unless there is adequate evidence of the value of the stolen items to sustain a jury's finding that their value exceeded $100. The court in *Wilson, supra,* said that the proof of value could not rest on "conjecture or

ises does not serve to negate the validity of the seizure of the items which the officers discovered in plain view simultaneous to appellant's arrest.

8. Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

9. Robinson v. United States, 333 F.2d 323 (8th Cir. 1964); Stevens v. United States, 297 F.2d 664 (10th Cir. 1961); United States v. Wilson, 284 F.2d 407 (4th Cir. 1960); Cartwright v. United States, 146 F.2d 133, 135 (5th Cir. 1944).

surmise," even though the property involved in that case consisted of 72 rifles which had been stolen from the government; the court therefore refused to take judicial notice of the fact that the weapons were worth more than $100. (284 F.2d at 408.)[10]

We think this rule is eminently sound: when there is a possibility of convicting the defendant of either grand or petit larceny—offenses which carry significantly different penalties and which are distinguished solely by the value of the property taken—it is essential that the government introduce evidence of that value in order to give the jury a firm basis upon which it can render a verdict.

In the present case a motion was made at the end of the government's case for a judgment of acquittal on the grand larceny charge, based on the lack of evidence as to the value of the articles taken. (Tr. 486.) The trial judge was very much disturbed by this failure on the part of the government, as the following excerpt from the transcript indicates:

THE COURT: What is your proof on grand larceny * * * ?

[THE GOVERNMENT]: Your Honor, there is, of course, the testimony of Mr. King [the pawnbroker] that the typewriter, the resale value of the typewriter was between 50 and 55 dollars.

\* \* \* \* \* \*

THE COURT: Let's assume it's worth $55. Where is your proof to get over $100?

[THE GOVERNMENT]: Your Honor, I will say that from the testimony by Mr. Finger concerning the original value of the various items taken from him the jury may conclude beyond a reasonable doubt that the total of those items was worth more than $100.

THE COURT: Where do they get their evidence?

[THE GOVERNMENT]: From his statement of what the original value of it was at the time it was purchased.

THE COURT: He bought three shirts at $12 in 1965. Where does the jury have any evidence to determine what those three shirts were worth as of the time of the alleged burglary? There is not even any evidence as to the condition of the shirts.

\* \* \* \* \* \*

[THE GOVERNMENT]: * * * The witness, of course, is hardly an expert on the present value of an old shirt.

THE COURT: And no witnesses were called who were.

[THE GOVERNMENT]: That is right, Your Honor, but no witness could state such a thing, except as to an average value of an average shirt of that price.

THE COURT: We didn't have that, did we?

[THE GOVERNMENT]: Your Honor, I believe that there are cases in this jurisdiction that testimony of the complainant as to the original cost of the item is sufficient proof of value.

THE COURT: Cite me one.

[THE GOVERNMENT]: I can't cite you one off the top of my head, Your Honor, but I have read some cases.

\* \* \* \* \* \*

THE COURT: How does the jury determine the present value of a suit that was bought in 1964, four years before this event, and cost $38? * * There isn't any evidence.

---

10. We note that the state courts have also followed this strict rule concerning proof of value. In a recent Alabama case, for example, the court refused to take judicial notice of the fact that an automobile is worth more than the jurisdictional amount to constitute grand larceny. The court therefore reversed the conviction on the ground that such a conviction, in the absence of proof of value, did not respond to the indictment. Cooper v. State, 43 Ala.App. 385, 191 So.2d 224, cert. denied, 280 Ala. 711, 191 So.2d 229 (1966).

I will let you have over the lunch hour with respect to any cases that you wish to give me. I am not aware of any cases that permit this type of flimsy evidence to be used to establish value and I am inclined to grant that motion, particularly with the items not being found, many of the items not being found at the defendant's apartment or connected with him in any way.

\* \* \* \* \* \*

But in any event, we have old worn clothing, some of it patched and repaired, and there isn't anything that I can see that gives us any notion as to what it's worth. But I will let you have over the noon hour if you have a case that tells me that this is sufficient to go to the jury.

(Tr. 489–493.) Although the Assistant United States Attorney was given the opportunity to present the cases to which he referred, no cases were forthcoming after the noon recess. Our diligent search—and the search of the Assistant who prepared the government's brief on appeal—reveals no such rule in this jurisdiction. The inclination of the trial judge to grant the motion for judgment

of acquittal was a good one; we are compelled to reverse the grand larceny conviction only because that inclination was not followed.[11]

We are not prepared, however, to go as far as appellant asks us to go; he would have us void the larceny conviction altogether because the trial judge first stated that he would not charge the jury on the lesser included offense of petit larceny unless the defense specifically asked for such a charge.[12] Over the lunch recess referred to above, however, the judge changed his mind, and we think it was perfectly proper for him to do so. The district judge determined to give the lessor included offense charge as to petit larceny, stating: "I think it is a matter for the jury to determine on the basis of the proof." (Tr. 500.) Clearly there was evidence of larceny, the sole issue being whether the government was correct in charging grand larceny and then not offering proof thereof. Although we agree with appellant's contention—and the trial judge's initial reaction—that the government failed to prove grand larceny, and that there was not sufficient evidence upon which the jury could find appellant guilty thereof

11. Further evidence of the judge's disposition to grant the defendant's motion for acquittal on the grand larceny charge is found in the following colloquy:

> THE COURT: [T]he ruling in this Court \* \* \* has been that when the government charges a man he is entitled to go to trial on that and that alone, and if I am wrong some day you could correct me upstairs, but that is my feeling.
>
> [THE GOVERNMENT]·: In the case of grand or petit larceny it would be duplicitous [*sic*] to charge him in two separate counts with grand larceny and petit larceny of the same items.
>
> THE COURT: Yes, but where you overpaper cases I don't think you should have two bites at the apple, and this Court is receiving overpapered cases on a continuous basis from the Grand Jury Section of the U. S. Attorney's Office and the only way to stop it that I know of is to require the government to come to that standard of proof which their indictment charges.
> (Tr. 498–499.)

12. In pondering the question of whether or not he should send the case to the jury on the grand larceny charge in spite of the paucity of evidence on value, the trial judge stated to defense counsel:

> THE COURT: If I resolve this grand larceny matter in favor of the government is it your wish that I give the lesser included offense of petit larceny? Because that would be my instinct. \* \* \* [I]f I feel the government's evidence is sufficient to go to the jury on grand larceny you would be, if you wish it, entitled to the lesser included offense charge of petit larceny; but it is not my practice, and I want you to understand clearly, sir, it is not my practice to give the lesser included offense unless the defendant requests it. I do not give it on the request of the government.
>
> So you would have your choice in going for grand larceny on this evidence, all or nothing.
>
> [THE DEFENSE]: I will take all or nothing.
> (Tr. 497–498.)

without engaging in impermissible speculation, we think there is clearly sufficient evidence to uphold a conviction of petit larceny. We therefore reverse the grand larceny conviction and remand to the district court with instructions that appellant be re-sentenced in conformity with the sentencing guidelines for burglary in the second degree and petit larceny, if the learned trial judge ascertains that a different sentence is in order in light of the change in the larceny conviction, following his sentencing criteria under the Youth Corrections Act.

Affirmed in part and reversed in part.