STATE OF NEVADA, Appellant, v. LEO JOSEPH
LUCHETTI, JERRY LYNN KRAMER, CALVIN
LEE OLSON, PHILLIP RAYMOND SWARTZ, RICH-
ARD RAY HAMES and KELLY RAY KRAMER,
Respondents.

No. 6358

July 13, 1971                          486 P.2d 1189

*Robert List,* Attorney General; *Howard McKibben,* District
Attorney, and *William J. Crowell, Jr.,* Deputy District Attor-
ney, Douglas County, for Appellant.

*Manoukian & Manoukian,* of Zephyr Cove, and *Jack Chris-
tensen,* of Yerington, for Respondents.

## OPINION

By the Court, THOMPSON, J.:

This appeal by the State is from an order of the district court dismissing the information filed against the respondents which charged them with the unlawful possession of marijuana. Before dismissal, that court had granted the defendants-respondents' motion to suppress the physical evidence of marijuana seized by the arresting officer. We affirm the dismissal and the inter-locutory suppression order.[1]

The relevant facts are these: On March 9, 1970, thirteen young people, ages sixteen to twenty, were simultaneously arrested at a private home for the possession of marijuana. Some two hours earlier the arresting officer had received an anonymous tip that a pot party was there in progress. He forth-with made an initial check of the house, noticed several cars and youngsters there, and left to summon assistance. He did not attempt to secure warrants for arrest and search. Upon his return two hours later he approached the house and as he reached the open front door he smelled what he believed to be the odor of marijuana. Cf. Zampanti v. Sheriff of Clark County, 86 Nev. 651, 473 P.2d 386 (1970). He entered the

---

[1]Our decision in this case also disposes of cases Nos. 6359, 6360, 6361 and 6362 involving juvenile defendants who were arrested and charged with the same crime arising out of the same incident.

living room, noticed a grassy substance on the table in front of the sofa, and immediately placed all occupants under arrest and searched them individually. Cf. Woerner v. State, 85 Nev. 281, 453 P.2d 1004 (1969). When arrested, some of the young people were in the kitchen, some in the living room— who was where is not disclosed. None was smoking marijuana and the search of each produced nothing incriminating. None was in actual possession of marijuana. Some of the youngsters were then transported to the station and booked. The arresting officer searched the entire house in the absence of some but not all of the arrestees and seized from the bedroom and living room substances later identified by an expert to be marijuana. The owner of the home was absent when this entire incident occurred.

The officer had no justification for his warrantless search of any room other than that in which the arrest occurred. Chimel v. California, 395 U.S. 752 (1969). Accordingly, the incriminating evidence seized in the bedroom was properly suppressed for none of the defendants was arrested in that room. Moreover, since the record does not disclose the arrestees who were present in the living room and those who were absent when the search and seizure of evidence in that room took place, it cannot be said that the search and seizure was incident to the arrest of any particular, identifiable defendant. It is equally clear that the search and seizure was not incident to the arrest of those youngsters who had already been transported to the station. Obviously, those absent youths could not have endangered the officer's safety, or have concealed or destroyed evidence. The underlying rationale is expressed in Chimel. "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within

his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs— or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less." Id. at 762, 763.

Consequently, all evidentiary items produced by the officer's search of the home were properly suppressed. However, the grassy substance in plain view on the table in the living room was subject to seizure, Woerner v. State, 85 Nev. 281, 453 P.2d 1004 (1969), and was constitutionally admissible evidence. Although admissible, the record does not establish constructive possession of that substance in any defendant having the right to control the contraband. People v. Showers, 440 P.2d 939 (Cal. 1968). Accordingly, the dismissal was correctly entered.

Affirmed.

ZENOFF, C. J., and GUNDERSON, J., concur.

BATJER, J., concurring:

I agree that all the items suppressed were properly suppressed and that a dismissal must be granted, but I cannot agree that the dismissal was correctly entered by the trial court. The proper result was reached, but for the wrong reason. Wyatt v. State, 86 Nev. 249, 468 P.2d 338 (1970).

The district court judge said: "I think the crux of the matter is that there was evidence seized without any warrant issued at any time." It is apparent that he granted the motion to suppress because he was of the opinion that a search warrant should have been obtained before the officers returned and entered the residence, and because that procedure was not followed, the entire subsequent search and seizure was illegal.

Within the authority of Woerner v. State, 85 Nev. 281, 453 P.2d 1004 (1969), the officers had a duty, upon smelling the odor of marijuana smoke coming from the house, to enter the open door, and upon gaining entry and observing a marijuana like substance on the living room table to seize that evidence and arrest everyone in that room for possession of narcotics.

An immediate search of those arrested and a search of their immediate surroundings was permissible. Chimel v. California, 395 U.S. 752 (1969). The authority of *Woerner* does not permit the blanket arrest of persons in other parts of the house. Here the record is silent about the physical location of the arrestees at the time of arrest; therefore the dismissal as to all defendants must be affirmed, but not for the reason announced by the trial court.

MOWBRAY, J., dissenting:

I respectfully dissent.

The principal issue presented for our consideration on this appeal is centered about the admissibility in evidence of marijuana and other alleged narcotic paraphernalia that were seized when the respondents were arrested in a Kingsbury Grade, Douglas County, residence on the charge of the unlawful possession of narcotics. All the respondents, adults and juveniles, filed in the appropriate form in the court below, timely motions to suppress the seized evidence. After the district judge ruled in their favor in ordering the evidence suppressed, they moved to dismiss the complaint, and the district judge dismissed the complaints against all the respondents. The State has appealed from the lower court's orders suppressing the evidence and dismissing the complaints. I would reverse and remand all the cases to the lower court for trial.

1. *The Facts.*

The Sheriff of Douglas County received an anonymous telephone call on March 9, 1970, that, "If you want to bust a pot party, go to 187 Pine [Kingsbury Grade area, Tahoe Township]." The Sheriff directed one of his deputies, John Allmett, to drive by the premises and conduct an eyeball investigation. The deputy did so, and he reported that there were numerous persons entering and leaving the house and that five to eight cars were parked in the street near the home. The deputy returned to the area with several other officers about 2 hours later and observed the same activity underway. The officers parked their police cars, which were marked as such, and Allmett and another officer proceeded on foot to the premises. Immediately they noticed two boys leave the building. Upon seeing the officers, the boys promptly retreated to the house, leaving the front door open. As the officers approached the steps leading to the front door, Allmett detected a strong odor of burning marijuana. Without further ado, he walked through the open doorway and told all therein to "freeze." The respondents did so.

In the living room, which was in the immediate area of the entrance way, Allmett saw on a small table in open view a grassy substance that he recognized as marijuana. He placed all the respondents under arrest for the unlawful possession of narcotics, gave them the Miranda warning, and then searched the respondents and the premises. In the immediate room, which was the living room, the officer found in plain view the following: On a table in front of a sofa, an amount of grassy substance that the officer recognized as marijuana.[1] In front of the sofa and in plain view he also found a brown wooden smoking pipe, two containers of partially used cigarette papers, burnt matches, burnt ashes, and used cigarette papers. Underneath and near the front part of the sofa, the officer found two plastic bags containing a grassy substance and, next to the two bags, two cigarettes.[2] When the officer made this recovery, one of the occupants in the room volunteered the following:

"Q [by Deputy District Attorney Crowell]   While you were searching the premises, did anyone make—any one of these people inside, make a statement on any of the other people inside?

"A [by Officer Allmett]   There was one statement made by . . . [juvenile's name omitted].

"Q   What did he say?

"A   As I was recovering the evidence from underneath the sofa there in the living room, that would be the two cigarettes and the plastic Baggie containing the marijuana, he made a

---

[1]Excerpt from transcript of preliminary hearing:

"Q [by Deputy District Attorney William J. Crowell, Jr.]   What indications came to you that there was marijuana present at that time?

"A [by Deputy Sheriff John Allmett]   Well, the burning odor became intensely stronger in the living room.

"Q   That's the burning odor of marijuana?

"A   I believed it to be marijuana, yes.

"Q   What else did you do then?

"A   Well, I made the preliminary examination and on the table in front of the sofa there, in the southwest corner, I found an amount of grassy residue believed to be marijuana."

[2]"A [by Officer Allmett]   Yes, there was two plastic Baggies, one inside of the other. The inside one contained a small amount of a green, grassy substance; and it was found underneath the front portion of the sofa in the living room.

"Q   Any other places?

"A   Then, located right next to the Baggies underneath the sofa, there was two sloppily made, hand-rolled cigarettes, containing green, grassy substance.

"Q   Which you believed to be marijuana?

"A   Yes, I did."

statement to his companions, 'They've found it,' in a very surprised voice."

The officer also found in the jacket of one of the occupants, in the living room, a metal Sucrets container that held marijuana.[3] Additionally, the officer found in the bedroom leading off the living room the following:

"A [by Officer Allmett]    Getting to the bedroom, situated to the nearest balcony, the balcony—living room area, one of the bureau drawers, there was approximately a lid of marijuana—a lid of a grassy substance—in a plastic bag; and, then, behind the door to the bedroom, the same bedroom, located in the small plastic freezer bucket, there was a kind of brownish-green, weed-like material, believed to be tailings from manicured marijuana; . . ."

The officer carefully marked and marshaled the evidence so that it could be examined by a narcotics expert. It was so examined, and the expert testified at the hearing as follows:

"Q [by Mr. Crowell]    Would you state your name, please?

"A    Budd F. Rude.

"Q    Where do you reside, Mr. Rude?

"A    Carson City, Nevada.

"Q    And how long have you resided in this area?

"A    In this area, approximately ten years.

"Q    Are you employed, and, if so, where?

"A    State of Nevada, Department of Highways, Director of Criminalistics Division.

"Mr. CHRISTENSEN [An attorney for respondents]:    Your Honor, the defense is prepared to stipulate as to Mr. Rude's technical qualifications and ability to make an analysis of marijuana.

"THE COURT:    Thank you, counsel.

"Mr. MANOUKIAN [An attorney for respondents]:    For preliminary examination purposes, again.

"Mr. CROWELL:    I'll accept your stipulations.

"BY Mr. CROWELL:

"Q    Mr. Rude, I'm going to call your attention to what has heretofore been marked Exhibits J and K, and ask you if these

---

[3]"Q    Did you find anything else?
"A    Some more grassy substance found in the pocket of a jacket found lying on the sofa.
". . .
"Q    And what did you find in the pocket of that coat?
"A    There was a Baggie—plastic Baggie—containing a small amount of a grassy—green grassy substance. The Baggie was in turn contained in a metal Sucrets container."

were the packages which I asked you to deliver to Mr. Allmett earlier here.

"A   Yes, they are.

"Q   You will note that they have been opened. Would you tell the Court when you first received them and from whom?

"A   It was the 18th of March 1970, from John Allmett, at the Douglas County Courthouse.

"Q   From the time which you received them from Mr. Allmett, to the time you delivered them here in Court, were they in your possession?

"A   Yes, they were.

"Q   In your sole possession?

"A   That's correct.

"Q   Except for the purposes of analysis of the items contained, have they in any way been tampered with, adulterated or otherwise substituted, any of the items?

"A   No, sir.

"Q   You can state that the items presently here in court are in the same condition, save and except for the experimentation of your own, as when you received them from Mr. Allmett?

"A   That's correct.

"Q   Directing your attention to Exhibit J, Mr. Rude, and the packages contained therein, I would ask if you performed an analysis of the items therein?

"A   Yes, I did.

"   .  .  .

"Q   All right. In your expert opinion, with regard to your qualifications as an expert, would you please state what you found with regard to the various items in that exhibit?

"A   There's, I think, eleven or twelve items in here. You want me to take them item by item?

"Q   Yes, please.

   "Would you state the number of the item?

"A   Yes. Let's see. Item 1 contains a small, black pipe. This was tested for the presence of a residue found to be cannabis sativa or marijuana, and it was found to be present.

   "Item 3 was another larger wood pipe with a portion of the stem missing. This again was tested and found to contain the presence of cannabis sativa or marijuana.

   "Item 4 contained a plastic bag—or two, actually, plastic bags, one inside the other; and contained approximately one gram of plant material from the plant cannabis sativa or marijuana.

"Item 5, a plastic bag, containing two handmade—homemade cigarettes, which were found to contain cannabis sativa or marijuana.

". . .

"Item 8 was another brown pipe. This was found to have been used for smoking marijuana or cannabis sativa.

"Item 9 was a small piece of tinfoil or aluminum foil that contained some ashes, and so forth, remains of a burnt plant material, and this was found to be from the plant cannabis sativa or marijuana.

"Item 11, let's see, this had a matchbook torn in half and some cigarette papers, burnt and not burnt, and some green grassy material; and that was found to be from the plant cannabis sativa or marijuana.

". . .

"Item 13 was a plastic Baggie, containing 20.5 grams of plant material from the plant cannabis sativa or marijuana.

". . .

"Q All right. Now, I direct your attention to Exhibit K, and ask you to go through that exhibit.

"A Let's see. Item 16 was a small plastic—white plastic box, containing the remains or a cigarette butt of a homemade—handmade cigarette that contained some plant material from the plant cannabis sativa or marijuana.

"Item 19 was a small plastic bag and some green plant material. It was found to be 0.3 grams of material from the plant cannabis sativa or marijuana.

"Item 20 is a small, I guess you call it, a homemade pipe. It was several pipe fittings and a plastic tube attached to it. This was found to have a residue from the plant cannabis sativa present.

"Item 22 was a blue plastic box, containing several cigarettes—burnt cigarette butts; and these were found to have the remains of material from the plant cannabis sativa or marijuana.

"Item 23 was a red and white plastic tumbler. It contained some burnt matches and some ashes. Some remains of the plant material cannabis sativa were found in that.

"Item 24 was a metal Sucrets box, containing a small—or a plastic bag that in turn contained 6.7 grams of the plant material that was determined to be from the plant cannabis sativa or marijuana.

"Q All of these determinations were your expert opinion?

"A   Yes, they are.

"Mr. Crowell:   I have no further questions."

2.   *The Arrest.*

The respondents have argued on this appeal that their arrests were unlawful and that, therefore, the officer's search was not permissible, and hence the evidence obtained is not admissible. The majority opinion sustaining the respondents' position is primarily based upon the majority's interpretation of the rule announced in Chimel v. California, 395 U.S. 752 (1969). In that case, the arresting officers had a warrant for Chimel's arrest. They had time to seek a warrant to search his house. Rather than do so, they waited until Chimel arrived home, then arrested him and proceeded to rummage through his entire residence. The High Court simply said that such a warrantless search was unreasonable and not permissible under the Fourth and Fourteenth Amendments, that in such cases the search must be limited to a search of the arrestee's person and the area within his immediate control, and that in any event it may not go beyond the room where the arrest takes place.[4] I seriously question whether the rule of Chimel is applicable to the seizure of contraband in this case. Many of the items seized here were recovered minus any search, as they were within the plain view of the arresting officer. Chimel in no way over-ruled the Plain View Doctrine that contraband found within the sight of the arresting officer may be seized. A recent narcotics case decided by the United States Ninth Circuit Court of Appeals has so held. In United States v. Jiminez-Badilla, 434 F.2d 170 (9th Cir. 1970), the officer, without a warrant for the defendant's arrest, knocked on the defendant's motel door and arrested him, at which time he saw a shirt draped over a chair. Protruding from the shirt pocket was a rubber contraceptive visibly stuffed with powder, which the officer observed to be heroin. The court said, 434 F.2d at 173:

"Holding, as we do, that the arrest was upon probable cause and, therefore, valid, the only further question is whether the two *seizures* incidental to the arrest—(1) the seizure of the powder stuffed rubber protruding from the shirt, and (2) . . . —were unreasonable under the circumstances.

"Appellant contends that they were unreasonable within the meaning of Chimel v. California, [citation].

"As to the first item, the record is to the effect that its seizure required *no search;* that it was in the *plain view* of an officer who had the right to be in the position from which the

[4]The State concedes that only those items seized in the living room are admissible under the Chimel doctrine.

view was made; that it was in the immediate presence of appellant; that it reasonably appeared to contain contraband narcotics.

"In United States v. Avey, 428 F.2d 1159, 1164 (9th Cir. 1970), this court had occasion to quote from Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), after considering it in the light of *Chimel:*

> 'It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.'

"Under the circumstances we are of the opinion that the *seizure* of the contraband was not unreasonable within the meaning of *Chimel.*" (Emphasis added.) See also United States v. Thweatt, 433 F.2d 1226 (D.C.Cir. 1970).

The basic test of the lawfulness of the search remains the same as before Chimel, namely, one of reasonableness. In Chimel, the High Court said, 395 U.S. at 762:

"Only last Term in *Terry* v. *Ohio,* 392 U.S. 1, we emphasized that 'the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure,' . . . and that '[t]he scope of [a] search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible.' " (Footnote omitted; brackets in original.)

In the instant case, for the reasons stated below, there was no opportunity to obtain a search warrant prior to the arrest of the respondents because the officer could not have presented to a magistrate an affidavit showing probable cause for the issuance of a search warrant. It was not until the officer smelled the odor of burning marijuana coming through the open door that he had probable cause to believe a crime was being committed within the home. The record is clear that the officer was able to identify the odor of burning marijuana.[5]

---

[5]"Q [by Mr. Crowell]   And what did you do then, please?

"A [by Officer Allmett]   We approached the residence, and [Officer] John Brown and myself, as we were approaching the residence [187 Pine Drive], met two male subjects emerging from the house itself.

". . .

"Q   What did you do after meeting these two gentlemen?

"A   Well, I proceeded to the front door of the house, following the subjects. They were going back into the party. They entered the front door.

"Q   Pardon?

"A   They entered into the front door, left it open. John Brown

The respondents in their briefs have argued that their arrests were unlawful for the reasons that I shall discuss under their enumerated headings.

A.   The Absence of an Arrest or Search Warrant.

First, the respondents argued that the officers were duty bound to obtain a warrant for their arrest or search before investigating the scene. Respondents based this theory on the anonymous phone call received by the sheriff. The phone call alone would have been insufficient for the issuance of a warrant. Such warrants may not issue unless there exist reasonable grounds for their issuance. Draper v. United States, 358 U.S.

---

and myself, prior to entering the house, as we neared the front door, smelled a strong burning odor we believed to be marijuana.

"Q   How far away from the door were you at that time?

"A   Right at the door.

"Q   Mr. Allmett, how much experience have you had with the identification of marijuana in your past?

"A   Quite a bit.

"Q   Would you state for the Court what that included, please?

"A   Well, past experience, physical appearance, the burning smell of marijuana on numerous occasions.

"Q   How many times in your experience as a police officer, or otherwise, have you had occasion to come across marijuana or the burning thereof?

"A   Numerous occasions.

"Q   Can you give us an estimate? Ten thousand, a million?

"A   I'd say, at least a couple of hundred.

"Q   Have you had any formal training or schooling and education in the identification of marijuana?

"A   Yes, I have.

"Q   How much of that have you had?

"A   The identification of marijuana—it's probably ten hours altogether.

"Q   Have you participated in any arrests for the possession of marijuana, based on the smell of it?

"A   Prior to this incident? Yes, I have.

"Q   About how many times?

"A   I'd probably estimate maybe about a dozen.

"Q   Following up what you thought you had smelled, did you confirm what you found as marijuana?

"A   Yes.

"Q   Who usually does your confirming for you?

"A   A qualified chemist, usually either the Nevada State Highway Chief Chemist, Budd Rude, or Lloyd Whalen, Nevada Food & Drug, in Reno.

"Q   Did you believe yourself competent to distinguish the odor of burning marijuana?

"A   Yes, I did.

"Q   It was on the basis of this experience and your own competency that you recognized it as burning on this evening?

"A   I did."

307 (1959). An uncorroborated phone tip from an anonymous source is not sufficient to establish the reasonableness required. The reasons are quite obvious. Additionally, it is necessary to know something of the circumstances constituting the basis for the informer's call, his reliability, and other relevant factors that go to show that probable cause exists for the issuance of the warrant. Spinelli v. United States, 393 U.S. 410 (1969).

B.   The Officers' Investigation.

Respondents next complained that, when the officers approached the premises at 187 Pine Street, they became in fact trespassers, and their presence was unlawful. I would reject this contention. The officers had reasonable grounds to be on the premises—namely, to investigate the commission of a crime. Davis v. United States, 327 F.2d 301 (9th Cir. 1964). Assuming *arguendo* they were in fact trespassers, even so the constitutionality of the search and seizure would not be affected, for the test is one of reasonableness in the light of all the circumstances. People v. Terry, 454 P.2d 36 (Cal. 1969).

C.   Lack of Probable Cause.

Respondents next urged that the officers did not have probable cause to determine that a crime was being committed and therefore their arrests were improper. The officers observed the traffic leaving and entering the home, and as they approached the open front door they detected a strong odor of burning marijuana. The officers had probable cause to believe that a crime was being committed, and the ensuing arrests were proper. People v. Peterson, 88 Cal.Rptr. 597 (Cal.App. 1970); People v. Anderson, 88 Cal.Rptr. 4 (Cal.App. 1970). Cf. Woerner v. State, 85 Nev. 281, 453 P.2d 1004 (1969).

D.   The Unannounced Entry.

Finally, respondents challenged the legality of their arrests on the assertion that the officers had a duty to announce themselves before entering the home through the open doorway. Ker v. California, 374 U.S. 23 (1963). In Ker, the High Court held that the guaranties of the Fourth Amendment required announcement of entry before the resulting search could be considered reasonable, except in unusual circumstances.[6] Our own NRS 171.138 provides that a police officer

---

[6]For interesting discussions of the "no knock" issue, see Blakey, *The Rule of Announcement and Unlawful Entry: Miller v. United States and Ker v. California,* 112 Univ. of Pa. L.Rev. 499 (1964); *Unannounced Entry to Search: The Law and the 'No-Knock' Bill (S. 3246),* 1970 Wash. Univ. L.Q. 205 (1970); *Announcement in Police Entries,* 80 Yale L. Jnl. 139 (1970).

may, after seeking admittance to a house to make an arrest, make forcible entry if an offense is being committed in the building.[7] In this case, no announcement was made before entry, and it would have been senseless to have done so. Obviously the occupants had been made aware of the approach of the officers as soon as the boys returned to the house. The front door was open, and the odor of burning marijuana was coming from the house. This was a case where, as we say in the law, time was of the essence, and the circumstances did not afford the officers the formalities of announcing their intention to walk across the door stoop. A rather recent case of the United States Ninth Circuit Court of Appeals has held that an entry through an open door does not constitute such a "breaking" as to require an announcement before entry. Reyes v. United States, 417 F.2d 916 (9th Cir. 1969).

Our sister state of California has a statute similar to our NRS 171.138, *supra:* Section 844 of the California Penal Code.[8] The California courts have refused to require announcement of entry in open-door cases under various circumstances. See People v. Peterson, *supra;* People v. Anderson, *supra;* People v. Boone, 82 Cal.Rptr. 398 (Cal.App. 1969). I believe that an entry via an open door without prior announcement is permissible where an officer acting in good faith has reasonable grounds to believe that a demand for admittance may increase his peril, or frustrate an arrest, or permit the destruction of evidence, or where, as in the instant case, a crime is being committed beyond the open door but within the purview of the officer's senses. Cf. Fairman v. Warden, 83 Nev. 332, 431 P.2d 660 (1967).

I would, therefore, have ruled that, since respondents' arrests were in my opinion lawful, so was the resulting seizure of evidence. I would reverse and remand all the cases for further proceedings consistent with the views expressed in this dissent.

---

[7]NRS 171.138:

"To make an arrest, a private person, if the offense is a felony, and in all cases a peace officer, may break open a door or window of the house in which the person to be arrested is, or in which there is reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

[8]Cal. Penal Code § 844 (West 1970):

"To make an arrest, a private person, if the offense be a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."