William Norman **RICHARDSON**

v.

**STATE OF MARYLAND.**

**Civ. A. No. 20868.**

United States District Court,
D. Maryland.

March 7, 1975.

Correction, was indicted for statutory burglary of a bar in violation of art. 27, § 33 of the Md. Ann. Code (1971 Repl. Vol.). After a plea of not guilty, he was convicted by a jury in the Criminal Court of Baltimore (Criminal No. 205) and sentenced on February 2, 1968, by the Honorable Charles D. Harris to a prison term of six years "consecutive with any sentence for violation of Parole." The conviction was affirmed by the Maryland Court of Special Appeals in Clark v. Maryland, 6 Md. App. 91, 250 A.2d 317 (1969). Certiorari was denied by the Court of Appeals. Richardson v. State, 254 Md. 719 (1969).

Petitioner then began submitting habeas corpus petitions to this Court, which now total three. In the first one, among several allegations of constitutional infringements at trial,[1] the Petitioner asserted that he had been illegally arrested (and thus that tainted evidence, seized pursuant to the arrest, had been improperly admitted into evidence). This is the only issue presently under consideration. Relying on Fay v. Noia, 372 U.S. 391, 438–40, 83 S. Ct. 822, 9 L. Ed.2d 837 (1963), and Sanders v. United States, 373 U.S. 1, 17–18, 83 S. Ct. 1068, 10 L. Ed.2d 148 (1963), this Court rejected Petitioner's contention, since he did not object to the introduction of evidence at the time of his original trial; and since he failed to state what items, if any, were seized and thereafter improperly admitted into evidence contrary to the Fourth Amendment. Richardson v. Warden, Civil Action No. 20868W (D. Md. June 17, 1969) (unpublished memorandum opinion and order). The second habeas corpus petition once again questioned the admissibility of the evidence,[2] but the petition was similarly denied on the authority of *Noia* and *Sanders*, and also because Pe-

William Norman Richardson, pro se.

Francis B. Burch, Atty. Gen., and Harry A. E. Taylor, Asst. Atty. Gen., Baltimore, Md., for respondent.

WATKINS, Senior District Judge.

William N. Richardson has a long and varied history before this Court and the courts of Maryland, so that a brief discussion of his judicial activity is particularly apropos. Petitioner, presently incarcerated in the Maryland House of

---

1. Petitioner also alleged that he was not allowed counsel during interrogation or the preliminary hearing.

2. This time Petitioner also claimed that:

(b) The Trial Court erred in refusing to issue a summons and/or a bench warrant for an important defense witness.

(c) The evidence was insufficient to sustain the conviction.

titioner was then appealing the first decision of this Court to the Fourth Circuit Court of Appeals. Richardson v. Warden, Civil Action No. 20868W (D. Md. Nov. 26, 1969) (unpublished memorandum opinion and order).

On appeal to the Fourth Circuit, that court dismissed Petitioner's first petition without prejudice due to his failure to exhaust state remedies under the Maryland Post Conviction Procedure Act, Md. Ann. Code art. 27, § 645A *et seq.* (1974 Cum. Supp.). Richardson v. Warden, Civil Action No. 13,690 (4 Cir. April 22, 1970) (unpublished memorandum decision).

Pursuant to the recommendation of the Fourth Circuit, Petitioner filed under the Maryland Post Conviction Procedure Act in the Criminal Court of Baltimore, and on June 5, 1970, a hearing was held before the Honorable George D. Solter. Counsel was appointed to represent Petitioner, and a "Supplemental Petition" was submitted by his attorney. Judge Solter denied Petitioner's Application of Post Conviction Relief for the reasons stated in his unpublished memorandum opinion of August 21, 1970. Richardson v. Warden, P.C.P.A. No. 1959. In an unreported opinion and order filed January 15, 1971, the Court of Special Appeals denied Petitioner's appeal from Judge Solter's decision.

A third habeas corpus petition was submitted by Petitioner in which he once again asserted that tainted evidence had been improperly admitted during trial.[3] This Court disposed of that contention in Richardson v. Warden, Civil Action No. 20868W (D. Md. June 4, 1973) (Order to Show Cause), by refer-

ence to the principle of *res judicata,* and passed judgment adverse to Petitioner on the remaining viable allegation. Richardson v. Warden, Civil Action No. 20868W (D. Md. July 5, 1973) (unpublished memorandum opinion and order).

Petitioner appealed this Court's decision concerning the third habeas corpus petition to the Fourth Circuit. The Court of Appeals reversed in part due to this Court's failure to consider the legality of Petitioner's arrest on the merits, saying:

> Richardson, however, had exhausted his state remedies in the interim between this court's dismissal of his alleged illegal arrest claim on appeal and the filing of the habeas corpus petition now under review. It was error, therefore, for the court not to address this claim on the merits. Accordingly, we remand to the district court for a determination of the legality of the arrest, and, in accordance with our policy of liberal construction of prisoner's petitions, to determine if there were any collateral consequences of a constitutional nature resulting from any illegal arrest procedures.

Richardson v. Warden, No. 73–1981 (4 Cir. Feb. 14, 1973) (unpublished memorandum decision).

## DISCUSSION OF THE FACTS[4]

■ In order to determine the legality of the arrest and the admissibility of the seized evidence, a brief recital of the facts leading up to the arrest is necessary.

■ At approximately 2:30 a. m. on October 30, 1967, Officer Earl Gillespie

---

3. Technically, Petitioner merely asserted that his arrest was illegal. He also claimed that he was denied the effective assistance of counsel and that he was denied counsel at the preliminary hearing.

4. In Maryland, the jury in a criminal case is the judge of both the facts and the law. Consequently, hearsay was admitted into evidence during Petitioner's trial for the sole purpose of the jury determining whether or

not the police had acted upon probable cause when they arrested Petitioner. (Tr. 39–40). Throughout the rest of this Memorandum Opinion and Order, any hearsay is considered by this Court only insofar as it relates to "probable cause" for the arrest and the "reasonableness" of the search and seizure. Of course, hearsay is admissible for these limited purposes. *See, e. g.,* Scott v. State, 2 Md. App. 705, 237 A.2d 79 (1968).

of the Southwestern District of the Baltimore City Police Department was approached by a private citizen who complained of excessive noise at his apartment complex on 1821 West Pratt Street. (Transcript 14, 48). The officer went to an apartment where a party was taking place, knocked and after the door was opened, requested the ten to fifteen occupants to quiet down. (Tr. 15, 49). While there, the officer noticed the Petitioner; a James R. Clark, Petitioner's co-defendant at trial; and at least one or two women—presumably the remaining people were men. (Tr. 15, 48). In addition, the officer observed a number of quart beer bottles and beer cans spread throughout the kitchen and the two other small rooms of the apartment, but saw no alcoholic beverages other than beer. (Tr. 15–16, 48).[5]

Subsequently, the officer returned to the same apartment to talk with a Melvin Henson after receiving a second complaint from another private citizen (Tr. 40–41)[6] to the effect that Henson and two other white males were surreptitiously carrying packages from a neighboring car lot to the apartment complex across the street when no cars or people were in sight. (Tr. 40–41). During this second visit to the apartment between 4:00 a. m. and 5:15 a. m., the police officer noticed, from a distance of six to eight feet (Tr. 56), that twenty-five to forty bottles of alcohol

were neatly stacked against the kitchen wall. (Tr. 18, 42, 55, 58). On the labels of each visible bottle of alcohol were large letters or numerals (Tr. 18) written in blunt black crayon. (Tr. 20, 47, 55–56). The officer asked the group of occupants, which had now slimmed down to about eight people (Tr. 17, 45), to whom the alcohol belonged. Clark replied that it was his, that he bought it. (Tr. 18, 42). At this time the officer believed he saw Petitioner sitting on a kitchen chair next to the stolen alcohol. (Tr. 59, 33).[7]

The officer left and shortly thereafter proceeded to the Mount Cafe bar, 1701 Frederick Avenue, Baltimore, Maryland, approximately a block and one-half from the apartment, after learning from a police radio-phone call that there was serious trouble at that location. (Tr. 43). Upon arriving he was informed that a large quantity of alcohol had been stolen and saw that all the remaining bottles of alcohol had black crayon markings on the labels, similar to those which he had observed at the apartment on his second visit. (Tr. 44).

Correlating the present incident with what he had seen earlier (Tr. 43–44), the officer returned to the apartment at approximately 6:15 a. m. to "stake it out" until his superior could complete the burglary investigation at the bar. (Tr. 51). At 6:30 a. m. or 6:15 a. m. the Petitioner and Clark started to come out of the apartment. (Tr. 44, 52, 24).

---

5. There can not be an unlawful "search" unless one's Fourth Amendment right to privacy is invaded, and there can be no invasion or violation of one's rights if a police officer is at a place where he lawfully has a right to be. During all three visits to the apartment, Officer Gillespie was lawfully there, and anything which he observed in "plain view" was not "search." *See infra,* in the text, the discussion of "plain view."

6. Information provided to the police by a witness has generally been deemed more reliable than that of a paid informant. *See, e. g.,* Brown v. United States, 125 U.S. App. D. C. 43, 365 F.2d 976, 979 (1969).

There is some confusion as to whether or not Officer Gillespie was informed of the surreptitious dealings of the three white males by one (Tr. 41) or two (Tr. 16) citizens. The Court, however, does not consider this inconsistency of any great importance.

7. At times, reference will be made to comments or statements which were made outside of the jury's hearing at the bench, or while the jury was not even in the courtroom. Such reference will be made, however, only in connection with this Court's determination as to whether the officer had probable cause to effect the arrest, and acted reasonably during the search and seizure.

One of them, probably the Petitioner (Tr. 52, 37–38),[8] was carrying in his sport coat pocket a half-pint of "Pikesville" whiskey (Tr. 44) on which there were black crayon markings (Tr. 10, 44–45, 54). The two were told to re-enter the dwelling, since they and everyone in the apartment were being arrested[9] and " . . . held for investigation of burglary."[10] (Tr. 45, 51–52). Fifteen minutes later the police sergeant arrived. A warrantless search of the apartment produced only four bottles of alcohol, all of which had black crayon markings on the labels (Tr. 10); cigars of the same brand as ones stolen from the bar; and a jar of hot sausages, apparently similar to a jar stolen from the bar. (Tr. 45–46). At that point, Petitioner (a white man), Clark (a white man), three other white men and three women were taken down to the Southwest Police Station for questioning. (Tr. 53).

During the trial, after being recalled, Officer Gillespie further testified that a warrant had been issued for Melvin Henson's arrest, but that he had not been apprehended yet. Additionally, the officer mentioned that June Cowan, the hostess of the party, probably had been charges with possession of stolen goods. (Tr. 98–99).

The only physical evidence introduced at trial was the four bottles of alcohol, all of which were marked with a blunt black crayon. Three of the bottles were seized from the apartment, while the fourth one, the Pikesville, was taken from the Petitioner (or perhaps Clark). (Tr. 10, 45–46, 54). The cigars and the jar of sausages which the police officer referred to during his testimony were not introduced into evidence.[11]

## LEGAL DISCUSSION

*Introduction:*

It should be noted at the outset that Petitioner has "standing" to contest the alleged illegal search and seizure. Mancusi, Warden v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

 From a review of the trial transcript and the Post Conviction opinion of Judge Solter, it is clear that the standard of Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) has been met and that a plenary evidentiary hearing is not mandated, nor

8. In reiterating the facts, this Court states that Petitioner was "probably" the one in possession of the half-pint of Pikesville. The trial transcript reads, at page 52:
 Q. You don't know which one had the half pint [of Pikesville]?
 A. Believe it was Richardson.
 Q. But not sure?
 A. Not exactly positive at this time. I was at the time . . . .
 Q. Can't tell the Jury for sure who had this half pint of whiskey in his pocket, can you?
 A. No.

9. From a reading of the record, this Court concludes that the Petitioner had not left the apartment at the time the police officer arrested the Petitioner. Assuming, *arguendo*, that the Petitioner had left the apartment, this Court further concludes that the officer's order for Petitioner and Clark to return to the apartment was reasonable under the circumstances. If Officer Gillespie had attempted to arrest all eight of the occupants of the apartment, or even to arrest solely the Petitioner and Clark, his safety might have been in danger. Additionally, there would have been a greater opportunity for any of the eight either to escape or to destroy evidence if the officer had tried to effect the arrest without any assistance. Consequently, this Court concludes that the search was sufficiently "incident" to the arrest, and that it did not exceed the permissible scope or area prescribed by pre-*Chimel* law.

10. Although Officer Gillespie detained Petitioner for purposes of "investigation," this does not invalidate his arrest. Ralph v. Pepersack, 335 F.2d 128, 133–35 (4 Cir. 1964).

11. Hereafter, the testimony concerning the cigars and sausages will not be discussed. Assuming, *arguendo*, it was improper for the police officer to mention these items, such error, if error at all, was harmless beyond a reasonable doubt.

even advisable. Since the crucial facts of this case were largely uncontested, with the exception of some dispute as to who possessed the bottle of Pikesville, the merits of all factual disputes have been resolved. Additionally, the State factual determination is fully supported by the record as a whole, and the fact-finding procedures employed by the State provided Petitioner with a full and fair hearing in which all material facts were fully developed. Consequently, the factual determinations of the State are adopted. Townsend v. Sain, *supra* at 318, 83 S.Ct. 745. *See also*, Heisler v. Cox, 431 F.2d 581, 582–84 (4 Cir. 1970); Thornhill v. Peyton, 420 F.2d 477, 478 (4 Cir. 1969); Ladd v. South Carolina, 415 F.2d 870, 872–73 (4 Cir. 1969), *cert. denied*, 397 U.S. 1049, 90 S. Ct. 1384, 25 L.Ed.2d 663 (1970); Hamric v. Bailey, 386 F.2d 390, 393 (4 Cir. 1967); Stevens v. Warden, 366 F.2d 565, 568–69 (4 Cir. 1966), *cert. denied*, 385 U.S. 1031, 87 S.Ct. 765, 17 L.Ed.2d 679 (1967).

This Court holds that the evidence introduced during Petitioner's trial was properly admissible. The opinion will first discuss the existence of probable cause for the arrest, and next consider the "reasonableness" of the subsequent search and seizure. Finally, the officer's "plain view" of the Pikesville whiskey, and the potential error in the introduction of the other three bottles of alcohol will be scrutinized.

*Probable Cause for the Arrest:*

██ From the facts of this case, one colorable argument that the Petitioner could raise is that the items seized from the search of the apartment ware inadmissible because the police did not have a warrant. Such a proffer could rest on Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925), where the Supreme Court classically reiterated the general rule regarding warrantless searches and seizures:

Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause. *See also*, Coolidge v. New Hampshire, 403 U.S. 443, 451, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971); Jones v. United States, 357 U.S. 493, 497–98, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1957); Johnson v. United States, 333 U.S. 10, 14–15, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

The purpose of this rule is to ensure the right to privacy guaranteed by the Fourth Amendment. Warden v. Hayden, 387 U.S. 294, 304, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In comparing the relative importance of Fourth (and Fifth) Amendment rights with other constitutional guarantees, the Court has commented:

. . . such rights are declared to be indispensable to the "full enjoyment of personal security, personal liberty and private property" . . . they are to be regarded as the very essence of constitutional liberty . . . .

Gouled v. United States, 255 U.S. 298, 303–04, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921). In fact, as early as 1886 the Supreme Court expressed concern over encroachment upon the Fourth Amendment, advising all lower courts against any close and literal construction which might emasculate the purpose of the Amendment. Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

There are, however, some "specifically established and well-delineated exceptions" to this general rule. *Coolidge, supra*, 403 U.S. at 455, 91 S.Ct. 2022. One of the most historic and recurrent exceptions is that a warrantless search and seizure may be conducted incident to a lawful arrest. *See, e. g.*, Weeks v. United States, 232 U.S. 383, 392, 34 S. Ct. 341, 58 L.Ed. 652 (1914); Carroll v. United States, 267 U.S. 132, 158, 45 S. Ct. 280, 69 L.Ed. 543 (1925); *Agnello*,

*supra,* 269 U.S. at 30, 33, 46 S.Ct. 4; Marron v. United States, 275 U.S. 192, 198–99, 48 S.Ct. 74, 72 L.Ed. 231 (1927).

In the instant case the Petitioner alleges that his warrantless arrest was illegal. Thus, it must be determined whether or not the police acted with "probable cause." Solely for the purpose of this part of the opinion, it should be assumed that, if probable cause were lacking, the search and seizure were illegal; accordingly, the evidence would be tainted and inadmissible at trial.

■ Maryland's law regulating warrantless arrests must be examined, since the law of the state where the arrest took place governs. *Cf.* United States v. Di Re, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Johnson v. United States, 333 U.S. 10, 15 n. 5, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Subsection (c) of art. 27, § 594B of the Md. Ann. Code (1971 Repl. Vol.), which is merely declaratory of existing common law, states:

> A police officer may arrest a person without a warrant if he has probable cause to believe that a felony has been committed or attempted and that such person has committed or attempted to commit a felony whether or not in his presence or view.

*See,* Shorey v. Warden, Maryland Penitentiary, 401 F.2d 474, 477 (4 Cir. 1968); Richardson v. Snow, 340 F. Supp. 1261, 1263 (D. Md. 1972); Hebron v. State, 13 Md.App. 134, 146, 281 A.2d 547 (1971).

In Hebron v. State, 13 Md. App. 134, 146, 149, 281 A.2d 547, 553, 555 (1971), the Maryland Court of Special Appeals aptly defined "probable cause":

> Ordinarily it exists when the facts and circumstances within the knowledge of the arresting officer, or of which he had reasonably trustworthy information, are sufficient to warrant a reasonably cautious person in believing that a crime had been committed by the person arrested. The rule of

probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse a mere suspicion. Only the probability and not a *prima facie* showing, of criminal activity is the standard for probable cause.

> \* \* \* \* \* \*

> . . . in dealing with probable cause we deal with probabilities. These are not technical; they are factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved. Radcliffe v. State, 6 Md. App. 285 [251 A.2d 11]. Compare Brown v. State, 5 Md. App. 367 [247 A.2d 745].

In somewhat the same language, the Fourth Circuit has commented:

> The existence of "probable cause" is to be determined by the application of a practical, not a technical, standard. The meaning of the phrase has been so frequently stated as to require little elaboration here. Probable cause is something more than mere suspicion and something less than evidence which would justify a conviction. *The essence of all definitions of probable cause for arrest is reasonable ground for belief that a crime has been committed and the person arrested committed it.*

> \* \* \* \* \* \*

> No single litmus-paper test will provide the answer when probable cause is at issue; we look instead to the totality of the circumstances. And the pertinent circumstances are those of the moment, the actual ones, the ones that confronted the arresting officers. Officers patrolling the street at night do not prearrange the setting and they cannot judge events in the calm of an office. Things just happen, and as they happen the officers must choose to act or not. *Our inquiry is*

*whether their action was that of reasonable and prudent police officers in view of the circumstances as they appeared at the time of arrest.* [emphasis added; footnotes and citations omitted].

Ralph v. Pepersack, 335 F.2d 128, 132 (4 Cir. 1964). For similar definitions, *see, e. g.,* Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Ker v. California, 374 U.S. 23, 35, 83 S. Ct. 1623, 10 L.Ed.2d 726 (1963); Henry v. United States, 361 U.S. 98, 102, 80 S. Ct. 168, 4 L.Ed.2d 134 (1959); Brinegar v. United States, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 156, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); United States v. Peisner, 311 F.2d 94, 104 (4 Cir. 1962).

This Court finds that the circumstances in the early morning hours of October 30, 1967, were such as to give a reasonable, cautious and prudent man probable cause to arrest the Petitioner. In fact, as Judge Solter mentioned in his Post Conviction opinion, " . . . it is difficult to imagine a more classic case for the belief that a felony had been committed and that the Petitioner and his co-defendant had participated in the commission of the felony." Richardson v. Warden, P.C.P.A. No. 1959 at 3 (Criminal Court of Baltimore, Aug. 21, 1970) (unpublished memorandum opinion and order).

Returning to the facts, the police officer noticed during the initial visit to the apartment that beer cans were spread throughout, but did not see any alcohol other than beer. Officer Gillespie then received a report from a private citizen that Melvin Henson and two white males: " . . . had been carrying packages across . . . Pratt Street, ducking into 1821 [the apartment complex where the arrest took place] when there was no traffic, no one seen on the street. They would wait and run into the alleyway with the packages . . . ." (Tr. 40). He returned to the apartment in question to see twenty-five to forty bottles of liquor on the kitchen floor, each visible bottle having large letters or numerals written on the labels in blunt black crayon.

It was certainly "unusual" that all of the bottles had large black numerals or letters inscribed on the labels. It was "somewhat suspicious" that there was such a large quantity of hard alcohol for the use of such a small number of people. It was "very suspicious" that the large quantity of liquor had suddenly appeared between 2:30 a. m. and 5:15 a. m. when most bars and liquor stores were closed. However, it was more than merely "very suspicious," considering the police's accumulated knowledge, that Henson and the two white males should be so concerned about being seen at 4:00 in the morning as they attempted to cross Pratt Street.

This Court, nevertheless, does not have to determine whether the police had probable cause to arrest Petitioner during the second visit. The arrest was not then made. Two other things furnished the police with additional and maybe unnecessary facts which support the existence of probable cause: (1) the "plain view" sighting of the bottle of Pikesville in Petitioner's (or Clark's) possession, and (2) the knowledge that a felony had been committed.

If Petitioner were the one the police officer saw with the Pikesville whiskey, there is a great deal of legal significance to this observation. It is well-settled in Maryland that, absent a satisfactory explanation, exclusive possession of recently stolen goods permits the trier of the facts to draw an inference strong enough to sustain a conviction that the possessor was either the thief, or the receiver of the stolen goods. *See, e. g.,* Anglin v. State, 244 Md. 652, 656–63, 224 A.2d 668 (1966), cert. denied, 386 U.S. 947, 87 S.Ct. 984, 17 L.Ed.2d 877 (1967) (housebreaking); Howard v. State, 238 Md. 623, 624, 209 A.2d 604 (1965) (burglary); Stapf v. State, 230 Md. 106, 108, 185 A.2d 496 (1962) (larceny); Boggs v. State, 228

434

Md. 168, 172, 179 A.2d 338 (1962) (receiving stolen goods); Ponder v. State, 227 Md. 570, 572, 17 A.2d 839 (1962) (burglary); Lewis v. State, 225 Md. 474, 475–76, 171 A.2d 244 (1961) (burglary and larceny); Booker v. State, 225 Md. 183, 186, 170 A.2d 203 (1961) (armed robbery); Glaros v. State, 223 Md. 272, 280, 164 A.2d 461 (1960) (larceny); Butz v. State, 221 Md. 68, 77–78, 156 A.2d 423 (1959) (burglary); Jordan v. State, 219 Md. 36, 46, 148 A.2d 292, cert. denied, 361 U.S. 849, 80 S.Ct. 105, 4 L.Ed. 2d 87 (1959) (receiving stolen goods); Felkner v. State, 218 Md. 300, 304–05, 146 A.2d 424 (1958) (burglary). The Supreme Court has consistently upheld the drawing of such an inference. For example, in Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896), the Court stated:

> Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence. [citations omitted].

*See also,* United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965); Casey v. United States, 276 U. S. 413, 48 S.Ct. 373, 72 L.Ed. 632 (1928); Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925); McNamara v. Henkel, 226 U.S. 520, 33 S.Ct. 146, 57 L.Ed. 330 (1913); United States v. Ballard, 449 F.2d 782 (4 Cir. 1971); United States v. Williams, 405 F.2d 14 (4 Cir. 1968).

■ Logically it would seem that, if possession of recently stolen goods can give rise to an inference which directly results in conviction, then possession of such goods provides all the requisite "probable cause" for the warrantless arrest of the Petitioner. As stated above, "probable cause" does not require evidence which would be sufficient to convict, but merely enough facts to form a reasonable ground for the belief that Pe-

titioner was guilty. Ralph v. Pepersack, 335 F.2d 128, 132 (4 Cir. 1964); Hebron v. State, 13 Md.App. 134, 136, 281 A.2d 547 (1971).

■ Even if the Petitioner were not the man who had the liquor bottle protruding from his sport coat pocket, this Court still concludes that Petitioner's presence during the "plain view" observation of the Pikesville has legal significance. It should be recalled that during his second visit Officer Gillespie believed he saw Petitioner sitting in the kitchen of the apartment close to the stolen alcohol. (Tr. 59, 33). Also, the policeman believed that Petitioner (and not Clark) was the one with the Pikesville in his coat pocket. In each case, although it may not have been conclusively established that Petitioner was in "exclusive possession" of the liquor, the police could draw an inference of guilt or complicity from these "plain view" sightings, even though a jury, on these facts alone, might fail to convict. Accordingly, due to Petitioner's recurrent proximity to the stolen alcohol and his companionship with the man who claimed he "bought" what later turned out to be stolen alcohol, this Court finds that, in light of all the other circumstances, the police had reasonable grounds to believe that Petitioner had committed the felony in question. *See,* e. g., Park v. Huff, 506 F.2d 849 (5 Cir. 1975).

■ Assuming that the police officer never viewed the bottle of Pikesville whiskey, it is just as clear to this Court that a reasonable, cautious and prudent individual had probable cause to arrest the Petitioner and detain all other individuals in the apartment after discovering the burglary and the presence of the twenty-five to forty marked bottles. When Officer Gillespie determined that the Mount Cafe bar had been burglarized, he had probable cause to believe that a felony had been committed, *i. e.,* that there had been a statutory burglary of a shop or storeroom in violation of art. 27, § 33 of the Md. Ann. Code (1971). Possessed with the knowl-

edge that the first test of the warrantless arrest statute and the common law had been met, the officer needed only to have probable cause to believe that Petitioner had committed the felony in order to effect a valid warrantless arrest.

Aside from the markings, the appearance of the large quantity of liquor during the early morning hours, and the secretive activity of three occupants of the apartment, at the time of the arrest the police possessed the additional knowledge that there had been a felonious burglary of liquor bottles, which had black markings on the labels similar to those observed in the apartment. The police believed, and not unreasonably, that the felons and the stolen property had been and might still be located at the apartment in question. Additionally, the discovery of the felony greatly enhanced the reliability of the private citizen who reported the surreptitious undertakings of the three white males.

 At trial, Petitioner's counsel argued that the police had no probable cause to arrest the Petitioner since they did not know the exact identity of the white male felons. On the facts of the present case this argument, however, is meritless. If the police had probable cause to believe that three of the white male occupants of the apartment were principals in the burglary of the bar, it was reasonable and entirely conceivable that others in the apartment were feloniously involved, possibly as aiders, abettors or co-conspirators. *See generally*, Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949).

There is a surprising dearth of authority on the validity of arresting a group of people when the police know for certain that only some members of a group have committed a felony. *See, e. g.*, Thompson v. State, 15 Md. App. 335, 290 A.2d 565 (1972). Of those cases known to this Court, most seem to support the validity of the arrest in the instant case. Others, which at first blush might seem to prohibit such an arrest, are clearly distinguishable on the facts or the law. In fact, some of the blatantly distinguishable cases, in reality, support the validity of the arrest in question.

The best expression of the general rule of law concerning conspiracy and association with criminals was enunciated in United States v. Di Re, 332 U.S. 581, 593, 68 S.Ct. 222, 228, 92 L.Ed. 210, 219 (1948), where the Court stated:

> The argument that one who "accompanies a criminal to a crime rendezvous" cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. * * * Presumptions of guilt are not lightly to be indulged from mere meetings.

In that case, there was no evidence that the defendant was present when the overt criminal act took place, or that he heard or took part in any conversation. In fact, the informant who participated in the criminal acts did not even testify at trial concerning the defendant's guilty knowledge. Additionally, it was not shown that the defendant, even if he had been present when the contraband passed hands, had any way of knowing that the items were contraband.

Comparing the instant case with those facts which the Court in *Di Re* felt were important, there is direct and circumstantial evidence here which gives rise to a reasonable inference that the Petitioner and others in the apartment had knowledge of, or participated in, the burglary of the bar. First, the Petitioner was present in the apartment during the policeman's first and second visits, and thus was probably there when the stolen alcohol was brought into the apartment. Second, Petitioner was a white male,

thereby matching the description given by the private citizen who reported the secretive activities of the three white males carrying the packages into the apartment. Third, at the time of the second visit, Petitioner was sitting in the kitchen, very close to the stolen alcohol. (Tr. 59, 33). Fourth, it is reasonable to believe that anyone who was aware of the newly found alcohol might have asked or heard a discussion as to how and why it appeared. After all, the provider had made a very magnanimous gesture in furnishing the alcohol, and it had appeared at an unusual hour, with unusual markings. Fifth, the Petitioner had started to leave the apartment in the company of the man (another white male) who alleged that he had "bought" what turned out to be stolen alcohol. Sixth, unlike *Di Re*, it did not take an expert witness to identify the contraband as stolen property. Indeed, after discovering the burglary, the police knew from a prior cursory look that the alcohol was stolen property. Seventh, the carrying of the packages across Pratt Street was very secretive and suspicious, totally unlike the factual situation facing the Court in *Di Re*. Considering the critical facts of the present case as emphasized in *Di Re*, and other facts known by the police, it appears that the general rules laid down by the Supreme Court establish that probable cause for Petitioner's arrest existed here due to his association with and relationship to the crime and the criminals.

There are two cases dealing with conspiracy and probable cause for arrest which are relevant to the discussion. Both cases found that there was no probable cause for arrest, but both are distinguishable. In Banks v. Pepersack, 244 F.Supp. 675, 677–78 (D. Md. 1965), Judge Northrop, now Chief Judge of this District, found that "[t]he primary reason for the arrest was that Banks [the defendant] was a known narcotics addict and was found on the premises during the [drug] raid." Additionally, the testimony clearly indicated that "[t]he officers had no information concerning Banks' and were in fact surprised to find him there." Clearly, *Banks* is distinguishable from the instant case on its facts, since the police were anything but surprised to find the Petitioner at the apartment, and since, for reasons stated above in the *Di Re* discussion, the Petitioner was not arrested merely because he was present.

*Banks* is distinguishable from a legal standpoint also. Apparently the government attempted to justify the arrest of Banks on the theory that possession of narcotics is a misdemeanor for which no warrant is required in order to effect a valid arrest. However, under Maryland law a warrantless arrest may be made only if a misdemeanor is committed in the presence of an officer. Md. Ann. Code art. 27, § 594B(a) and (b) (1971). According to Judge Northrop, Banks did not commit a misdemeanor in the presence of the police, and thus the warrantless arrest was illegal. In the instant case, the police arrested the Petitioner for commission of a felony; consequently, part of the holding of *Banks* is inapposite to the case in question.

The second case relevant to this discussion is United States v. Vigo, 357 F. Supp. 1360 (S.D. N.Y.1972). There, Vigo and two other individuals were unknowingly under police surveillance while at a bar. According to a reliable informant, Vigo and the others were going to leave the bar in an effort to return some heroin to the supplier. The three individuals did in fact leave the bar, went to a housing project to pick up a woman by the name of Pagan, and then proceeded to drive around, stopping at several bars. Once it appeared to police that the car was going no particular place, the police stopped the car and arrested all four occupants. Under these circumstances, the court held:

While the agents had probable cause to believe that defendant Vigo was committing violations of the federal narcotics laws and that contraband was located in his car, they had no probable cause to believe that defendant Pagan was involved in that crimi-

nal activity. Therefore, her arrest was unlawful and the search [and seizure] of her purse cannot be upheld as being incident to her arrest.

*Vigo, supra* at 1365.

It is clear to this Court that Pagan had done nothing, other than being present with suspected felons, which would even cause the police to be suspicious. On the other hand, if as in the instant case the police had reliable information that a white woman was the supplier, and police had previously seen her in plain view of a white powder, and if she were present, at the scene before and after the white powder had appeared, then the result in *Vigo* would have been entirely different.

Another case deserves mentioning, primarily because it is well-known and bears, by analogy, some relevance to the case in question. In Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L. Ed. 436 (1948), government agents were told by an informant that unknown persons were smoking opium in a hotel. Later the informant called to say that he had actually smelled it burning. Four experienced narcotics agents then went to the room where the recognizable odor was coming from, knocked and asked to be admitted. After some conversation between Johnson and the agents through an open door, the defendant was informed that she was under arrest and that a search was going to be conducted. As expected, the agents recovered incriminating opium and a warm smoking apparatus. In discussing the illegality of the arrest, the Court based its opinion on the government's admission that the agents did not have probable cause to arrest Johnson because they did not know who was present in the room.

The facts of the present case, needless to say, are plainly distinguishable. Here, during all three visits to the apartment, Officer Gillespie specifically noticed the Petitioner. Clearly, the police did not have to enter the Pratt Street apartment to know who the occu-

pants were. *Johnson* is also distinguishable for a second reason. As pointed out in United States v. Burruss, 306 F. Supp. 915, 919 (E.D. Pa.1969):

The [*Johnson*] Court clearly stated that the arrest there was not based upon other reliable information apart from the identity of the defendant.

As shown earlier, there is clearly other very credible information which the police relied upon as a basis for probable cause for the arrest. Indeed, considering the facts of *Johnson* and the rules it set forth, this Court believes that *Johnson* does not have to be distinguished from the instant case, because it supports the arrest herein.

Likewise, United States v. Vilhotti, 452 F.2d 1186 (2 Cir.), rev'g in part, 323 F. Supp. 425 (S.D. N.Y.1971), after careful analysis, would seem to validate the arrest of Petitioner. Based upon an informant's tip, federal and state agents staked out a warehouse in which they believed that recently stolen merchandise was being stored until sale. About 9:00 a. m. one morning, Vilhotti, Mercurio and Santa arrived at the warehouse and were arrested while inside the garage in "plain view" of numerous stolen goods. Shortly thereafter, a fourth person by the name of Maloney arrived, and he too was immediately arrested when he knocked on the garage door. At trial, no additional evidence was introduced as to Mercurio's and Santa's complicity, but it was shown that Maloney had in his possession on arrest a list of the stolen property which had been removed from the garage and money sufficient to pay for the removed goods. As to Vilhotti, there was evidence to the effect that he had been seen in the vicinity of the garage on two or three other occasions, and that he probably had a key to the garage. In summing up the facts and reaching its conclusion, the lower court found that there was probable cause for Mercurio's and Santa's arrest.

The circumstances of these arrests certainly support, at the very least, an inference of knowledge on the part of

Santa and Mercurio of the criminal enterprise in which Vilhotti was then engaged. Santa and Mercuiro were not simply in the presence of a known criminal. They were in the company of a key suspect on highly suspicious premises at the time when illicit dealings, likely to involve a number of persons, were expected. Indeed, they were arrested in plain view of the stolen merchandise sought to be suppressed. While Kelly's [the police officer's] knowledge of Santa's past criminal involvements lent further support to his suspicion, the circumstances alone afforded probable cause to arrest. Mercurio's arrest, therefore, was not any less warranted. An officer need not know the identity of a person to have probable cause for arrest. United States v. Llanes, *supra*, 398 F.2d [880] at 883 [2 Cir. 1968].

The Second Circuit reversed Mercurio's and Santa's conviction, but not because the police lacked probable cause to arrest the two:

> We hold that the mere presence of Santa and Mercurio in the garage is *insufficient as a matter of law* to establish either actual or constructive possession.
>
> \* \* \* \* \* \*
>
> The absence of any evidence, apart from their mere presence, to support the government's contention that Santa and Mercurio knew that the stolen goods were in the garage, similarly requires a reversal of their conviction on the conspiracy count. [emphasis added].

*Vilhotti, supra* at 1188–89.

From the above quoted language it is apparent that the Second Circuit is not attacking the existence of probable cause for Mercurio and Santa's arrest, but is attacking the sufficiency of the evidence, as a matter of law, to convict the two. This fact is revealed in the court's discussion of Maloney's conviction:

"We find ample evidence to support Maloney's conviction as a principal . . . ." *Id.* at 1188. By implication, for the court to find that Maloney's conviction was valid, the Second Circuit was required to find that Maloney's mere presence in such a suspicious setting provided sufficient probable cause for his arrest. Without reiterating the facts of the present case again, it should be apparent from a comparison of the two cases that the police here had much more reason to suspect guilt or complicity than did the government agents in *Vilhotti*. See also, United States v. Steward, 451 F.2d 1203 (2 Cir. 1971); United States v. Kearse, 444 F.2d 62 (2 Cir. 1971); United States v. Casalinuovo, 350 F.2d 207 (2 Cir. 1965).

When all is said and done, the question is very simple: Did the police act reasonably in believing that the Petitioner committed a felony? If their belief was reasonable, the arrest was legal.

Considering all the facts and surrounding circumstances during the early morning hours of October 30, 1967, this Court concludes that the police had the right to detain all of the occupants of the apartment, at least in order to question them concerning the burglary. Such a detention constitutes an arrest according to, *e. g.*, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[12] but it would seem that there was no other alternative. Needless to say, the police could not have conducted an effective investigation in the instant case, or hardly any other case for that matter, if they were required to interview a suspect while the potential felon walked down the street to his car or his own residence. Nor does this Court consider that an arrest warrant was practical or necessary under the circumstances. If the police had attempted to get a warrant for the arrest of Petitioner, it could not have been obtained in time because Officer Gillespie, who was

12. *See also*, Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Shorey v. Warden, Maryland State Penitentiary, 401 F.2d 474, 477 (4 Cir. 1968); United States v. Gearhart, 326 F.2d 412, 414 (4 Cir. 1964).

on the "stake out," would have had to detain and thus arrest the Petitioner when he attempted to leave the apartment. The officer could not have permitted the Petitioner to leave because of the danger that Petitioner might flee or go into hiding. The reasonableness of the officer's conduct is borne out by the fact that Melvin Henson, the third white male involved in the burglary of the bar, had still not been located at the time of trial. Additionally, it was imperative that the police restrain the activities of those in the apartment to some extent so as to prohibit the destruction of the fruits of the crime. Although bottles of alcohol are not as easily disposed of as, for example, heroin, they can be transported to another location, or broken and flushed down the toilet. Indeed, the facts of the case support the reasonableness of the police's relatively quick action, i. e., only four of the twenty-five to forty bottles seen by Officer Gillespie during his second visit were recovered. At some point between 4:00 a. m. and 5:30 a. m. there had been the disposition of a large quantity of liquor.

*The "Reasonableness" of the Search and Seizure:*

 As discussed above, normally a warrantless search and seizure is illegal unless it falls within one of the specifically delineated exceptions of the general rule. These exceptions exist because the Fourth Amendment does not prohibit all searches and seizures, only those which are "unreasonable." In the instant case, since the arrest was legal, the police could validly search the apartment and seize the fruits or instrumentalities of the crime.

Despite their authority to conduct a warrantless search and seizure in this case, the extent to which the police could search and seize was circumscribed. The purpose of such a limitation, which has been set forth in numerous Supreme Court decisions, is to prevent general, exploratory searches. Just because a

person has been legally arrested does not mean that he loses all Fourth Amendment rights to privacy of person and property.

Accordingly, the Supreme Court has specified what does and what does not run afoul of the Fourth Amendment prohibition against "unreasonable" searches and seizures. As shall be explained below in more detail, initially the Supreme Court held that a warrantless search and seizure incident to a lawful arrest need only be "reasonable." Later, in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Court altered the standard, in effect redefining the meaning of "reasonable," because it felt that the old standard permitted too many of the forbidden exploratory searches. Henceforth, the new criterion was to be that warrantless searches incident to valid arrests must be limited to the arrestee's person and the "area within his immediate control."

The *Chimel* standard, however, is not to be applied retroactively. Williams v. United States, 401 U.S. 646, 651, 91 S. Ct. 1148, 28 L.Ed.2d 388 (1971); Hill v. California, 401 U.S. 797, 802, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971). This is true whether the conviction involving a particular search and seizure is on direct appeal, or is being collaterally attacked. *Williams, supra,* 401 U.S. at 656, 91 S.Ct. 1148; *Hill, supra,* 401 U.S. at 802, 91 S.Ct. 1106. Thus, all searches and seizures conducted prior to the date *Chimel* was handed down (June 23, 1969) are governed by pre-*Chimel* law.

Because the search in the present case took place on October 30, 1967, it is clear that pre-*Chimel* law controls. At first glance, however, it is not so apparent what the law was prior to *Chimel*. The cases of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L. Ed. 653 (1950), appear to epitomize the

pre-*Chimel* law. On the other hand, Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931), and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932), which preceded *Harris*; Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948), which intervened between *Harris* and *Rabinowitz*; and Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), which followed *Rabinowitz*; might create some doubt as to what exactly is the controlling pre-*Chimel* law. *Go-Bart, Lefkowitz, Trupiano* and *Preston,* for one reason or another, were more restrictive in their interpretation of what is a "reasonable" search and seizure. *Harris* and *Rabinowitz,* on the other hand, permitted more extensive and intensive searches and seizures than did the other cases. *See also, Chimel, supra,* 395 U.S. at 756–64, 760 n. 4, 768 n. 15, 89 S.Ct. 2034.

From a close reading of both the facts and the holdings of *Chimel, Williams* and *Hill,* this Court concludes that these cases implicitly apply the less restrictive standards of *Harris* and *Rabinowitz* to pre-*Chimel* searches and seizures. Many other courts agree with this analysis. For example, the Fourth Circuit expressed its view of pre-*Chimel* law in Porter v. Ashmore, 421 F.2d 1186, 1189, 1190 (4 Cir. 1970), when it held:

> The validity of the search in this case must be determined under the rules promulgated in . . . Rabinowitz . . . and Harris . . . both of which were overruled by *Chimel.*
>
> \* \* \* \* \* \*
>
> *Rabinowitz,* however, specifically overruled *Trupiano* . . . .
>
> \* \* \* \* \* \*

Under the rule of *Harris* and *Rabinowitz* it is clear that a search incident to a lawful arrest may extend beyond the immediate vicinity of the one arrested. [citations omitted].

Similarly, Judge Harvey of this District stated in United States v. Frazier, 304 F. Supp. 467, 470 (D. Md. 1969):

> In both cases [Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L. Ed.2d 728 (1969), and Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969), wherein the Court refused to determine the retroactivity of *Chimel,*] the Supreme Court in finding the search and seizures to be improper applied the constitutional standards prevailing before *Chimel,* as set forth in Harris . . . and . . . Rabinowitz . . . . [citations omitted].

*See also,* United States v. Walden, 464 F.2d 1015, 1020 (4 Cir. 1972); United States v. Kind, 433 F.2d 339, 341 (4 Cir. 1970); Hayden v. Warden, 363 F.2d 647, 651 (4 Cir. 1966); United States v. Lee, 308 F.2d 715, 718 (4 Cir. 1962); United States v. Boyette, 299 F.2d 92, 94 (4 Cir. 1962). *See, e. g.,* United States v. Bankston, 424 F.2d 714, 717 (5 Cir. 1970); United States v. Valdes, 417 F. 2d 335, 340 (2 Cir. 1969), aff'g, 280 F. Supp. 172, 175 (S.D.N.Y. 1968).

Since *Harris* and *Rabinowitz* accurately set forth the pre-*Chimel* law, their facts and holdings are critical to the instant case. In *Harris,* five FBI agents arrested the defendant in his apartment pursuant to two valid arrest warrants. Following the arrest, the agents searched the entire apartment, expecting to find two stolen checks and perhaps instrumentalities of the crime. "[A] careful and thorough search proceeded for approximately five hours," before the agents discovered various Selective Service cards which were unlawfully altered and concealed. In judging the "reasonableness" of the search and seizure, the Court stated:

> This Court has also pointed out that it is only unreasonable searches and seizures which come within the constitutional interdict. The test of reasonableness cannot be stated in rigid and absolute terms. "Each case is to be

decided on its own facts and circumstances." Go-Bart Importing Company v. United States, 1931, 282 U.S. 344, 357 [51 S.Ct. 153, 158, 75 L.Ed. 374]. (1931).

\*　\*　\*　\*　\*　\*

. . . in Agnello v. United States, *supra* [269 U.S.] at page 30, [46 S.Ct. 4 at page 5, 70 L.Ed. 145], it was said: "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted." It is equally clear that a search incident to arrest, which is otherwise reasonable, is not automatically rendered invalid by the fact that a dwelling place, as contrasted to a business premises, is subjected to search.

Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested. Petitioner was in exclusive possession of a four room apartment. His control extended quite as much to the bedroom in which the draft cards were found as to the living room in which he was arrested.

\*　\*　\*　\*　\*　\*

. . . the area which reasonably may be subjected to search is not to be determined by the fortuitous circumstances that the arrest took place in the living room as contrasted to some other room of the apartment.

\*　\*　\*　\*　\*　\*

The same meticulous investigation which would be appropriate in a search for two small canceled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still.

\*　\*　\*　\*　\*　\*

The search was not a general exploration but was specifically directed to the means and instrumentalities by which the crimes charged had been committed, particularly the two canceled checks . . . .

\*　\*　\*　\*　\*　\*

There was evidence connecting petitioner with that theft [of the two checks]. The search which followed the arrest was appropriate for the discovery of such objects. Nothing in the agents' conduct was inconsistent with their declared purpose.

*Harris, supra,* 331 U.S. at 150–53, 67 S.Ct. at 1101, 91 L.Ed. at 1406–1407.

The fact pattern and legal analysis of *Rabinowitz* are very similar to *Harris*. In the *Rabinowitz* case a printer was arrested by federal officers for possessing plates which were used to forge "overprints" on canceled stamps. The printer informed authorities that the defendant, a stamp dealer, had purchased a large number of forged overprints from him. Thereafter, a postal employee bought four overprints from the defendant, and it was determined from analysis that these stamps were forgeries. Upon obtaining additional incriminating information and a valid arrest warrant, government agents and two stamp experts went to defendant's place of business and made the arrest. After searching the desk, safe and the file cabinets in the office for about an hour and a half, the agents seized 573 stamps, all of which proved to be forged.

According to the Court, the issue before it was: "Could the officers search his desk, safe and file cabinets . . . all located under respondent's immediate control in his one-room office open to the public?" *Rabinowitz, supra,* 339 U.S. at 60–61, 70 S.Ct. at 433, 94 L.Ed. at 657. In addition to enumerating many

of the principles set forth in *Harris,* the *Rabinowitz* Court held:

> In the instant case the search was not general or exploratory for whatever might be turned up. Specificity was the mark of the search and seizure here.

> \* \* \* \* \* \*

> We think the District Court's conclusion that here the search and seizure were reasonable should be sustained because: (1) the search and seizure were incident to a valid arrest; (2) the place of the search was a business room to which the public, including the officers, was invited; (3) the room was small and under the immediate and complete control of respondent; (4) the search did not extend beyond the room used for unlawful purposes; (5) the possession of the forged and altered stamps was a crime, just as it is a crime to possess burglars' tools, lottery tickets or counterfeit money. [footnotes omitted].

> Assuming that the officers had time to procure a search warrant, were they bound to do so? We think not, because the search was otherwise reasonable . . . .

*Rabinowitz, supra* at 62, 63–64, 70 S.Ct. at 434, 94 L.Ed. at 658, 659. *See also,* Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); James v. Louisiana, 382 U.S. 36, 86 S. Ct. 151, 15 L.Ed.2d 30 (1965); Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

■ In *Harris* and *Rabinowitz,* the Supreme Court did not fashion an infallible litmus paper test for what is a "reasonable" search, but certain principles can be gleaned. First, the search must be for *specific* items, and not a general exploration. *See also,* Rees v. Peyton, 341 F.2d 859, 863 (4 Cir. 1965). Second, the *scope* of the search is limited by the size of the item for which the search is being conducted. In other words, one would not expect to find a car in the desk drawer. Third, the *extent* of the search is limited to those places within the arrestee's control and possession. The police could not, for example, search another building which was removed from the scene of the arrest.

■ Comparing *Harris* and *Rabinowitz* with the facts of the instant case, this Court finds that the search and seizure of Petitioner and the apartment in question were "reasonable" because: (1) the search and seizure were incident to a lawful arrest; (2) the police certainly had probable cause to believe that the stolen alcohol was in the apartment since it had been observed in plain view at an earlier point in time; (3) the search was specific in nature and not a general exploration; and (4) the search, even if conducted throughout every room of the apartment, would not have extended beyond that area over which Petitioner had control.

■ In regard to the specificity and scope of the search, several other legal principles are relevant. First, an illegal arrest and detention in and of themselves are insufficient grounds for habeas corpus relief, absent a showing that the arrest resulted in an unfair trial. *See, e. g.,* Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). Even if the arrest were illegal and thus the subsequent search invalid, the Petitioner at best would be entitled to suppress those "fruits" of the alleged illegal arrest and search. Grundler v. North Carolina, 283 F.2d 798, 802 (4 Cir. 1960). In somewhat the same vein, if some evidence were obtained pursuant to a valid arrest and search, but at the same time other evidence were "tainted" by an unreasonable search and seizure, then only the tainted evidence would be denied admission into evidence. The untainted evidence from the same search would still be admissible, and the defendant would suffer no criminal preju-

dice due to its admission, or due to the fact that part of the search and seizure were unreasonable. *See, e. g.,* United States v. Blue, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); United States v. Ragsdale, 470 F.2d 24, 31 (5 Cir. 1972).

The Petitioner could argue, and quite properly so, that there is no evidence in this case concerning the specificity or scope of the search, and so its "reasonableness" cannot be determined. It is clear, however, that this defect in the proceedings is irrelevant. In this case the only items introduced into evidence were the four bottles of alcohol. As intimated above, any search and seizure which produced the alcohol was *per se* "reasonable" because the police had authority to search for the bottles of alcohol in any place in the apartment where the bottles might reasonably be expected to be secreted. If any evidence were obtained through a violation of *Harris* or *Rabinowitz* and hence part of the search was unreasonable, such evidence was not introduced at trial and could not have possibly prejudiced the Petitioner.

*"Plain View" and "Harmless Error":*

 It is clear that at least one piece of real evidence introduced at the trial, *i. e.,* the bottle of Pikesville whiskey, was properly admitted regardless of the validity of the arrest and search. The Pikesville was seen in "plain view" by Police Officer Gillespie during his third visit to the apartment. The officer did not infringe upon anyone's right to privacy when he observed the bottle. He was merely standing in a common, public hallway when the Petitioner (or Clark) began to leave the apartment with the incriminating evidence jutting out of his sport coat pocket. The validity of the seizure of this bottle and its introduction into evidence cannot be seriously questioned. *See,* Coolidge v. New Hampshire, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

*See also,* Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L. Ed. 877 (1932); Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), and Stanley v. Georgia, 394 U.S. 557, 571, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (Steward, J., concurring in result), where police, who have a search warrant, find in "plain view" during the search other admissible items of an incriminating nature; Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), where the police inadvertently see evidence in "plain view" while in "hot pursuit"; Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), where police, in making a valid search incident to a lawful arrest, also seize incriminating evidence in plain view; and Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); and Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), where police, who are not searching for evidence against the accused, seize evidence inadvertently coming into "plain view."

 Since the Pikesville was properly admissible, this Court finds that the introduction into evidence of the other three bottles, if error at all, was harmless beyond a reasonable doubt. Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); United States v. Welch, 496 F.2d 861 (4 Cir. 1974); Miller v. Cox, 457 F.2d 700, 703 (4 Cir. 1972); Close v. United States, 450 F.2d 152, 154 (4 Cir. 1971); United States v. Simuel, 439 F.2d 687, 689 (4 Cir. 1971); Leake v. Cox, 432 F.2d 982, 984 (4 Cir. 1970); Creasy v. Leake, 422

F.2d 69, 71 (4 Cir. 1970).[13] Furthermore, this Court finds that the "minds of the average jury" would not have found the State's case significantly less persuasive had the three bottles been excluded. Indeed, it would be an assumption of irrational jury behavior to think that the verdict would have been different if, instead of all four bottles, only the bottle of Pikesville were introduced into evidence.

## ORDER

It is, this 7th day of March, 1975, by the United States District Court for the District of Maryland, ordered:

1. That, for the reasons set forth in the written Memorandum Opinion in the above entitled case, which was filed March 7, 1975, the Petitioner's application for a writ of habeas corpus be and the same is hereby denied;

2. That leave to file in forma pauperis is hereby granted; and

3. That the Clerk of the Court is directed to mail copies of the Memorandum Opinion and this Order to the Petitioner and to the Attorney General of the State of Maryland.

13. For the history of the harmless error rule prior to *Chapman*, see, e. g., Motes v. United States, 178 U.S. 458, 20 S.Ct. 993, 44 L. Ed. 1150 (1900) (constitutional error held to be harmless); Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (where judge charged jury that there was only one conspiracy and there were in reality at least eight the improper instructions were prejudicial error); Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953) (post-conspiracy statement of co-conspirator, which was admitted against all defendants, was harmless error); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), rev'g 149 Conn. 577, 183 A.2d 256, (1962) (admission into evidence of "tainted" items was prejudicial error). *See also*, Long v. United States, 137 U.S. App. D.C. 311, 424 F.2d 799, 804–05 (1969); Coleman v. United States, 137 U.S. App. D.C. 48, 420 F.2d 616, 625 (1969); Otey v. United States, 135 U.S. App. D.C. 142, 417 F.2d 559, 562 (1969); United States ex rel Satz v. Mancusi, 414 F.2d 90 (2 Cir. 1969); United States v. Vallejo, 482 F.2d

616, 618 (3 Cir. 1973); United States ex rel Laws v. Yeager, 448 F.2d 74 (3 Cir. 1971); United States v. Mitchell, 427 F.2d 644 (3 Cir. 1970); United States v. Steinkoenig, 487 F.2d 225, 230 (5 Cir. 1973); Loftis v. Beto, 450 F.2d 599, 600 (5 Cir. 1971); United States v. Manning, 440 F.2d 1105, 1111–12 (5 Cir. 1971); United States v. Bankston, 424 F.2d 714, 717 (5 Cir. 1970). *But see*, Vaccaro v. United States, 461 F.2d 626, 634–39 (5 Cir. 1972); United States v. Laker, 427 F.2d 189, 190 (6 Cir. 1970); Turner v. United States, 426 F.2d 480, 483 (6 Cir. 1970); United States v. Cale, 418 F.2d 897, 899 (6 Cir. 1969); United States ex rel. Doss v. Bensinger, 463 F.2d 576, 579 (7 Cir. 1972); United States v. Nasse, 432 F.2d 1293, 1303 (7 Cir. 1970); United States v. Wick, 416 F.2d 61, 62 (7 Cir. 1969); Kaufman v. United States, 453 F.2d 798 (8 Cir. 1971); United States v. Warner, 428 F.2d 730 (8 Cir. 1970); Kaneshiro v. United States, 445 F.2d 1266 (9 Cir. 1971); Ignacio v. Territory of Guam, 413 F.2d 513 (9 Cir. 1969).