UNITED STATES of America

v.

**Nocario Justianiano MANZANILLA-de-JESUS and Jesus Nunez-Tapia, Defendants.**

**S 80 Cr. 693 (RWS).**

United States District Court,
S. D. New York.

Jan. 12, 1981.

---

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for United States; Roanne Mann, Asst. U. S. Atty., New York City, of counsel.

Arnold E. Wallach, New York City, for defendant.

## OPINION

SWEET, District Judge.

Defendant Jesus Nunez-Tapia ("Nunez") moves to suppress physical evidence and statements obtained by law enforcement authorities following his arrest on October 14, 1980 on charges relating to the armed hijacking of a tractor-trailer earlier that day. An evidentiary hearing was held on December 9 and 16. The following, pursuant to Fed.R.Crim.P. 12(e), constitutes the court's findings of fact and conclusions of law. For the reasons stated hereunder, the motion to suppress physical evidence is denied. The motion to suppress statements is granted in part and denied in part.

According to the testimony of Sgt. Michael McPartland of the Edgewater, N.J. Police Department, at about 4:15 P.M. on October 14 he and a partner in an unmarked patrol car spotted a moving tractor-trailer which matched, by description and registration, one reported by the F.B.I. to have been hijacked in New York a few hours earlier.[1] They pursued and stopped the vehicle, which was driven by Nunez. Nunez stepped down from the cab, asked why he had been stopped, was frisked and told he had been stopped for possession of a stolen vehicle. He volunteered that he had been hired to drive the truck and drop off the load, and was then placed under arrest, handcuffed and escorted into the patrol car. McPartland read Nunez the *Miranda* warnings from a standard rights card; he did not ask Nunez to sign the waiver on the reverse side of the card, and apparently did not ask him to acknowledge that he understood the rights and would answer questions. Nunez did not object to further questioning, and in response to questions made certain statements concerning his involvement. No promises or threats were made. All communication was in English, and from McPartland's observation, Nunez had no difficulty understanding or speaking English, and was cooperative throughout their encounter.

After the warrantless arrest, a series of shipping orders for merchandise belonging to Saks Fifth Avenue was seized from the dashboard of the tractor-trailer, and the trailer itself was later found to contain goods belonging to that company.

Within the hour, agents of the F.B.I., responding to McPartland's call, arrived on the scene, were briefed, and took over custody of Nunez. Agent Thomas A. Cottone, Jr., one of those present, testified that he first frisked Nunez, finding and removing a wallet stashed inside his left sock. The wallet was inventoried, and miscellaneous papers relevant to the investigation were found therein. Cottone testified that he then placed Nunez, still handcuffed, into the F.B.I. car, introduced himself, asked and was told by Nunez that he could not read or write English very well but could understand and speak it, orally informed Nunez of his *Miranda* rights, and asked and was told by Nunez that he understood his rights. Because Nunez had said he couldn't read or write the language very well, Cottone did not ask him to sign a rights waiver, but relied on his oral acknowledgements. Nunez then agreed to answer questions, and did so for approximately 45 minutes, never pausing to complain or to ask for an attorney. No promises or threats were made; no pressure was exerted. Again, all communication was in English. Cottone's observation was that Nunez spoke English fairly fluently.

By this time the agents considered that it was too late to bring Nunez before a magistrate or other appropriate officer of the law for arraignment that evening. Instead, after unsuccessfully trying to locate space for him in a federal detention facility, at about 9:00 P.M. they left him overnight at the Bergen County Jail in Hackensack.

Agent John Butenschoen of the F.B.I. testified that he and a partner picked up Nunez at the jail just before 10:00 A.M. the following day for transfer to the federal courthouse in Newark. During the ride, Butenschoen recited for Nunez his rights in English, and then held for him to read a standard F.B.I. form on which were printed the *Miranda* rights in both English and Spanish. Nunez indicated that he understood his rights, and proceeded to answer questions. According to Butenschoen, Nunez had little or no difficulty understanding or communicating in English, but he showed Nunez the Spanish printed version of the *Miranda* rights so as to take no chances. Nunez was delivered to and arraigned before a federal magistrate in Newark some time after noon.

Special Agent Brian Scadowski of the F.B.I. testified that he made those calls to the Edgewater Police based on information received not long after the crime occurred from an official of the company which owned the truck.

---

1. McPartland testified that the information on the crime and description of the tractor-trailer and its probable location came in two telephone calls to the Edgewater Police Department from the F.B.I.

Defendant, a 29 year old native of the Dominican Republic who received a high school education before coming to this country in 1969, gave testimony in Spanish, through an interpreter, which differed substantially on crucial facts from that of the government witnesses. Shortly after immigrating he came to realize that he would need some knowledge of the language, and spent a year in a manpower training course which included one hour a day of English. He apparently has had no formal language training since then, but testified that in his work as a shipping assistant and truck driver over the years it has been necessary to communicate in English with his workmates and others he deals with as a regular part of his job. Nunez lives in a Bronx neighborhood inhabited mostly by Hispanics, with whom he communicates in Spanish; he claims that he can read and understand English "a little," (including road signs and simple conversations), cannot write in English, and can speak "some, but not much." When asked if he could carry on a conversation in English for half an hour, he said "it would depend."

On the afternoon of his arrest, according to Nunez, after the initial brief conversation by the trailer cab, the police officers led him to the patrol car and started questioning him without having advised him of any of his *Miranda* rights; the F.B.I. agents then questioned him further without advising him of his rights. He understood almost everything asked of him, although there were some things he didn't understand. He asked for someone who could speak Spanish, and was told there was no one available. He had more trouble understanding some of the questions asked by the F.B.I. agents. The questions he understood he answered in English, telling his questioners, among other things, that he had been paid by certain individuals to drive the truck to New Jersey, and that he didn't know anything about the truck or its contents having been stolen.

Nunez acknowledged that in the F.B.I. car on the way to Newark the next morning, Agent Butenschoen showed him a rights form printed in English and in Spanish.[2] He had difficulty reading the form in the moving car while handcuffed, and told Butenschoen that he understood somewhat, "but not very well," and that he had never been arrested before and didn't know anything about these things. He was asked if he could afford a lawyer, and responded that he would talk with his family and see about it.

■ While arrests, searches and seizures based on valid warrants are preferred for constitutional reasons, *see, e. g. Arkansas v. Sanders*, 442 U.S. 753, 758–59, 99 S.Ct. 2586, 757–758, 61 L.Ed.2d 235 (1979); *United States v. Taborda*, 635 F.2d 131 at 136 (2d Cir., 1980), the validity of this warrantless arrest based on probable cause is not, and cannot, seriously be challenged. *See Chambers v. Maroney*, 399 U.S. 42, 47, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970); *United States ex rel. Mungo v. LaVallee*, 522 F.2d 211, 214–216 (2d Cir. 1975), *vacated* 428 U.S. 907, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976), *cert. denied*, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 289 (1977); *United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45 (2d Cir.), *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *see also United States v. Brawer*, 482 F.2d 117, 125 (2d Cir. 1973), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); *Richardson v. State of Maryland*, 398 F.Supp. 425, 434 (D.Md.1975). *Compare United States ex rel. Pella v. Reid*, 527 F.2d 380, 382 (2d Cir. 1975).

■ Further, Nunez may not complain of the seizure of the stolen tractor-trailer and its contents, including papers found on the dashboard of the cab, neither having nor claiming any "legitimate expectation of privacy in the area searched or in the articles seized." *United States v. Smith*, 621 F.2d 483, 486 (2d Cir. 1980). *See Rakas v.*

---

**2.** It was not clear from Nunez's testimony whether he denied that Butenschoen also recited the warnings in English. Additionally, in his affidavit Nunez claims that he was not given the *Miranda* warnings in any form by Butenschoen until after the questioning. His testimony at the hearing was not explicit on this point.

*Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *see also United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Similarly, Nunez may not complain of the seizure of his wallet, or of the search and seizure of its contents. It is not clear from the record whether the wallet was searched and the contents seized on the scene, or at some later time. The search and seizure are valid in either event. The frisk and seizure of the wallet from defendant's person are valid as incident to arrest, *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); *United States v. Mannino*, 635 F.2d 110 at 113 n.4 (2d Cir. 1980). The search and seizure of its contents is valid either as incident to the arrest, *see United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *United States v. Marchand*, 564 F.2d 983, 991 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), or as an inventory search. *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). *Compare United States v. Chadwick*, 433 U.S. 1, 16 n.10, 97 S.Ct. 2476, 2486 n.10, 53 L.Ed.2d 538 (1977).

Nunez moves for the suppression of all statements obtained as a result of questioning by New Jersey and federal authorities prior to his arraignment in Newark, urging violation of his Fifth and Sixth Amendment rights.[3]

Initially, Nunez apparently contends that on the afternoon of the arrest, neither the New Jersey nor the federal authorities gave him the *Miranda* warnings at any time before, during or after questioning him. Were the court to find this to be true, all statements elicited in response to questioning after his arrest would of course be suppressed. *Miranda v. Arizona*, 384 U.S.

436, 476–77, 86 S.Ct. 1602, 1628–1629, 16 L.Ed.2d 694 (1966); *Carter v. McGinnis*, 351 F.Supp. 787, 792–93 (W.D.N.Y.1972).

■ However, Det. McPartland and Agent Cottone both specifically testified that they did recite to Nunez the proper *Miranda* warnings before initiating interrogation. Having considered the testimony adduced and observed the demeanor of both of these government witnesses, I find as a matter of fact that the warnings were given to the defendant both times. This is, however, not the end of the inquiry. If after the warnings are given interrogation continues without the presence of an attorney and a statement is taken, the government still has the burden of demonstrating that the defendant acted voluntarily, knowingly and intelligently and thus validly waived his Fifth Amendment *Miranda* rights. *Miranda v. Arizona, supra*, 384 U.S. at 475, 86 S.Ct. at 1628. *See Tague v. Louisiana*, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980); *North Carolina v. Butler*, 441 U.S. 369, 372–73, 99 S.Ct. 1755, 1756–1757, 60 L.Ed.2d 286 (1979); *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

■ Nunez did not sign a waiver form, nor is there clear evidence of an explicit oral waiver; however, such is not a prerequisite to a finding of valid waiver. *North Carolina v. Butler, supra; United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). Rather, the validity of a purported waiver is to be determined upon consideration of the totality of circumstances, most notably the actions and words of the person interrogated. *North Carolina v. Butler, supra*, 441 U.S. at 373, 99 S.Ct. at 1757. Mere silence followed by response to interrogation will not suffice. *Id.* Nunez

---

**3.** Nunez's Sixth Amendment rights had not yet attached during the pre-arraignment questioning and processing here at issue. *See United States v. Duvall*, 537 F.2d 15 (2d Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). *Compare United States v. Aiken*,

Dkt.No. 80 Cr. 70, slip op. at 8–10 (S.D.N.Y. May 29, 1980); *aff'd. mem.* Dkt.No. 80–1302 (2d Cir. November 10, 1980); *United States v. Miller*, 432 F.Supp. 382, 387–88 (E.D.N.Y.1977), *aff'd. mem.* 573 F.2d 1297 (2d Cir. 1978).

claims no pressure or inducement. Nor is there evidence that he was threatened, tricked, or cajoled into a waiver. *See Miranda v. Arizona, supra,* 384 U.S. at 476, 86 S.Ct. at 1628–1629; *United States v. Burgos,* 579 F.2d 747, 750 (2d Cir. 1978); *United States v. Duvall,* 537 F.2d 15 (2d Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). His argument must be, simply, that even if the *Miranda* warnings were recited to him, his understanding of English is so limited that he did not understand them and thus could not have waived his rights knowingly and intelligently before making statements on the day of the arrest.

█ On the basis of all the evidence adduced, I find that Nunez is generally conversant in the English language; that his skills, at least in the spoken language, are a good deal greater than indicated by his own modest appraisal. Nonetheless, there was no testimony that Det. McPartland ever specifically asked Nunez whether he understood his rights, or that Nunez ever said he did, or anything of the sort. *See United States v. Vigo,* 357 F.Supp. 1360, 1367 (S.D. N.Y.1972), *reversed on other grounds,* 487 F.2d 295 (2d Cir. 1973). While the question is a close one, I find that the government has not satisfied its burden of demonstrating Nunez's intelligent and knowing waiver of the *Miranda* rights before interrogation by the New Jersey police.

█ The interrogating officer is under no obligation to elaborate on or explain the meaning of the *Miranda* rights as recited, *United States v. Isom,* 588 F.2d 858, 862 (2d Cir. 1978), and under other circumstances the court might presume the defendant's understanding; however, such a presumption is not altogether acceptable here. It is impossible for the court to determine on this record whether Nunez actually understood the rights as recited to him. However, Det. McPartland knew he was dealing with a non-native speaker. Nunez's testi-

mony that he specifically asked for a Spanish-speaking intermediary, and that this was his first such encounter with law enforcement authorities, stands uncontradicted. Under these circumstances it is perfectly conceivable that despite Nunez's working knowledge of the language he did not knowingly and intelligently waive the *Miranda* rights; his silence followed by answers to interrogation does not satisfy the government's burden. Therefore, any statements made to the New Jersey police officers after the initial encounter and arrest must be suppressed.[4] *E. g. United States v. Chansriharaj,* 446 F.Supp. 107, 109 (S.D.N.Y.1978); *cf. Forman v. Smith,* 482 F.Supp. 941, 950–51 (W.D.N.Y.1979).

█ I reach the opposite conclusion, however, with respect to the statements elicited in response to questioning by the F.B.I. agents shortly thereafter. Some of the factors are, of course, constant, but there are differences which I find to be of constitutional dimension. In addition to the testimony of Agent Cottone (similar to that of Det. McPartland), which I credit, that Nunez seemed to have no difficulty with the spoken language, Agent Cottone testified that he specifically asked and was told by Nunez that he could speak and understand English. Then, after reading Nunez his rights he specifically asked and was told by Nunez that he understood his rights and agreed to answer questions. Only then did the questioning begin, and in the course of the interrogation Nunez apparently never stopped to complain or to ask for an attorney. This set of facts, which I find to be accurate, is sufficient to constitute a valid waiver of the *Miranda* rights under the Fifth Amendment, Nunez's professed ignorance of what was transpiring notwithstanding. *North Carolina v. Butler, supra; see also United States v. Valdes,* 417 F.2d 335, 337–38 (2d Cir. 1969), *cert. denied,* 399 U.S. 912, 90 S.Ct. 2206, 26 L.Ed.2d 566 (1970); *United States v. Chansriharaj, supra,* at 110.

---

4. These statements thus must be excluded on the government's direct case. However, because there is no evidence that the statements were involuntary or inherently suspect, they

can be used to impeach the defendant's own testimony at trial. *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

Similarly, I find that the questioning of Nunez by F.B.I. Agent Butenschoen the next morning in the car on the way to arraignment in Newark was preceded by Butenschoen's reciting of the *Miranda* warnings in English, and his showing them to Nunez in written form in English and Spanish. I find further that Nunez understood his rights and indicated as much (despite his testimony to the contrary), and waived those rights without pressure or inducement when he answered Butenschoen's questions. *See North Carolina v. Butler, supra.*

■ Finally, although not specifically raised in the motion, defense counsel's questioning of government witnesses at the hearing implies a challenge to the admissibility of some or all of the statements on the ground of unnecessary pre-arraignment delay proscribed by Fed.R.Crim.P. 5(a) and 18 U.S.C. § 3501. Under the circumstances of this case as developed at the hearing, I do not find that the delay between arrest and arraignment, either on October 14 or the next morning, was such as to render Nunez's statements inadmissible. There has been no showing that any of this time was used unreasonably and unnecessarily for the purpose of wearing down the defendant and extracting an inculpatory statement. In the absence of such demonstration, given the hour of the arrest and the logistics involved, the conduct of the law enforcement authorities was not beyond the bounds of propriety. *United States v. Isom, supra,* at 862; *United States v. Burgos, supra; United States v. Barrera,* 486 F.2d 333, 338 (2d Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974); *United States v. Ortega,* 471 F.2d 1350, 1362 (2d Cir. 1972), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *United States v. Marrero,* 450 F.2d 373 (2d Cir. 1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972). *Compare United States v. Kehyaian,* 30 F.R.D. 544 (S.D.N.Y.1962).

IT IS SO ORDERED.